David R. WILSON, suing for himself and on behalf of all other citizens, et al., Appellants,

v.

CITY OF HENDERSON, Kentucky, and the City of Henderson Utility Commission, Appellees.

Court of Appeals of Kentucky.

Nov. 27, 1970.

Benj. C. Cubbage, Jr., Cubbage & Thomason, Henderson, for appellants.

Charles B. West, West, Markwell & Bryant, Henry C. Neel, Mitchell, Withers & Neel, George E. Stigger, III, Perdue & Stigger, Henderson, Cornelius W. Grafton, Grafton, Ferguson, Fleischer & Harper, Louisville, Robert E. Ferdon, Mudge, Rose, Guthrie & Alexander, New York City, for appellees.

CULLEN, Commissioner.

In this action, brought by a representative citizen, taxpayer and inhabitant of the city of Henderson, Kentucky, and by a representative owner of outstanding electric light and power revenue bonds of the city, against the city and its utility commission, judgment was entered upholding the validity of two ordinances of the city providing for the expansion of the city's existing electric power system by the construction of new generating facilities; for the issuance of revenue bonds to finance the construction; and for the making of contracts with Big Rivers Rural Electric Cooperative Corporation for use of joint facilities, operation of the new generating units, and sale of surplus power. The plaintiffs have appealed from that judgment.

For many years Henderson has operated a municipal electric light and power system. At the present time the system has

a load requirement of 34,820 kilowatts. Its existing plant has a *total* generating capacity of 48,000 kilowatts, but its *firm* capacity (the amount of capacity that would remain available if the largest individual generating unit became inoperable) is only 22,000 kilowatts. However, the city has interconnection agreements with other systems which give it an overall *firm* capacity of 44,000 kilowatts.

The evidence is that by 1973 the load requirement will have increased to 46,800 kilowatts, substantially equaling its total generating capacity and exceeding its *firm* capacity.

The expansion plan here in issue calls for the construction of two new generating units, each having a capacity of 175,000 kilowatts. The construction is to be financed through the issuance of revenue bonds in the amount of $76,000,000. The units will be erected on land adjoining an existing generating plant of Big Rivers. Under 30-year contracts, Big Rivers and the city will utilize jointly certain auxiliary facilities such as those for coal handling, water circulation and disposal, barge unloading and rail traffic; Big Rivers will provide personnel for physical operation of the city's new generating units; and Big Rivers will purchase all of the power generated by the new units in excess of the city's needs.

The evidence establishes that the annual load growth rate of the Henderson system during the past 16 years has been 10.98% while the national average has been approximately 7%, and that during the past five years the growth rate of the city system has been 12.58%; that Henderson is in an area that is widely held to be the fastest growing industrial area in the nation; and that plans have been made for annexation by the city of some 21,000 acres of territory. The evidence includes projections by fully qualified engineers that the load growth of the city's system will be such that within 20 years the entire *firm* capacity of the expanded plant will be needed by the city, and that within 10 years thereafter the *total* capacity of the expanded plant will be needed.

The theory of the plan for expansion of the city's electric system is that it will be most economical for the city to construct generating facilities substantially in excess of its present needs because (1) the construction cost per kilowatt of capacity for a large unit is considerably less than it would be for the construction in stages of small units; (2) present costs of labor and materials probably will be lower than those in the future; (3) large units can be operated at less cost per kilowatt hour than small units; and (4) the sale of surplus capacity during the growth period will pay a substantial part of the construction costs. The validity of this theory was attested to by competent engineers, who said that the plan was the *most feasible and economical of any that* could be used.

In Miller v. City of Owensboro, Ky., 343 S.W.2d 398, this court upheld a similar plan of the city of Owensboro, for construction of generating facilities in excess of the city's current needs and sale of the surplus to another utility during the growth period. Also, since the decision in the Owensboro case the statute under which the Henderson system is operated, KRS 96.520, has been amended to authorize agreements for the sale of surplus energy. The appellants argue, however, that the amount of surplus energy that will be available at the outset, under the Henderson plan, is so much more than there was under the Owensboro plan that the Henderson plan cannot be considered to be in the furtherance of a *public purpose* of the city, but rather is for the primary benefit of Big Rivers, and therefore the plan not only is unconstitutional but is not within the statutory authorization of KRS 96.520 for the acquisition by a city of electric light and power facilities for the purpose of "supplying the city and its inhabitants" with electric light, heat and power.

In the Owensboro case the estimates were that the city's load requirements would grow to equal the capacity of the expanded plant within 15 years. In the Henderson case the estimates are that the city's load requirements will grow to equal the capacity of the expanded plant, less one of the new generating units, within 20 years, and will equal the total capacity of the expanded plant within another 10 years. In the Owensboro case we held that the expansion plan was based on a reasonable anticipation of future needs, that it was a matter of sound economic planning to provide initially for a surplus capacity rather than to add to the plant on a piecemeal basis as the needs from time to time should arise, that the plan served a public purpose of the city, and that the sale of the current surplus of energy to Kentucky Utilities Company did not violate the statutes nor was it beyond the scope of a proper public purpose.

If the Henderson plan were to build only one new 175,000 kilowatt unit, instead of two, we could find no significant difference between the Henderson plan and the Owensboro plan. The only difference would be that it would take Henderson 20 years to reach full-capacity use of its new facility, as compared with 15 years for Owensboro. This is not a sufficient degree of difference to be material.

Henderson's plan is, however, to add *two* new 175,000 kilowatt units, and here there is a substantial variance from the Owensboro plan. The variance lies in the fact that Henderson proposes to provide *standby* or *reserve* capacity equal in amount to the capacity of its largest generating unit, thus giving its plant a *firm* capacity equal to its anticipated load requirement in the next 20 years. Owensboro made no provision for standby or reserve capacity, and its new construction did not increase its *firm* capacity at all, because the largest unit in its expanded plant was the new unit. Our question is, then, whether Henderson's provision for standby or reserve capacity (to be sold to Big Rivers pending an emergency calling for its use) is not within the scope of a valid public purpose.

■ Expert engineers testified that "safely under good utility practices" an electric light and power system should have sufficient *firm* capacity to meet its load requirements, which means that it must have standby or reserve capacity equal to the capacity of its largest generating unit, and which in turn means that if Henderson builds a 175,000-kilowatt unit it should have an equal amount of standby or reserve capacity. It appears that the matter of providing standby or reserve capacity is one of administrative judgment which would not be subject to interference by the courts in the absence of a manifest abuse, and in view of the testimony of the engineers there is no basis in this case for us to question the decision of the Henderson officials to provide sufficient standby or reserve capacity to give its plant a *firm* capacity conforming with good utility practices.

In summary, there is convincing evidence in this case that Henderson has a present inadequacy of generating capacity and will have a constantly and rapidly increasing need for additional capacity in the future; that good utility practices dictate that the city make provision for standby or reserve capacity equal to the capacity of its largest generating unit; and that the most feasible and economical plan for the city is to construct two large generating units now, anticipating the needs of the city for a substantial number of years ahead, rather than building a series of smaller units in stages as the need arises. We think that the evidence fully warrants the conclusion that the Henderson plan will primarily and not merely incidentally serve the public purposes of the city, and fully supports the findings by the circuit court that the plan constitutes the exercise by the city of a valid public purpose and is within the scope of the statutory authority of the city to supply the city and its inhabitants with electric light, heat and power.

This disposes of the main issue in the case. There remain a number of subordinate issues.

■ It is argued by the appellants that the Henderson plan violates Section 164 of the Kentucky Constitution, which governs the granting of "franchises," and Section 179, which prohibits a city from lending its credit to a corporation. Similar arguments were made, and rejected by this court, in the Owensboro case. We continue to adhere to the ruling there made.

At the present time there are around $7,000,000 in revenue bonds outstanding against Henderson's existing utility plant. The appellants herein suggest several respects in which they claim the proposed plan of the city will impair the rights of the holders of those bonds. The ordinance under which the outstanding bonds were issued provides for deposit of revenues, in designated amounts, first to the debt service or amortization account, next to the operation and maintenance account, and third to the renewal and replacement account. The ordinance provides that if a surplus should accrue in the renewal and replacement account, the city *may* use it for the retirement of the bonds issued under the ordinance. The new plan contemplates that the new facilities will be operated with the existing ones as a single, unified system; the liens of the outstanding bonds and of the new bonds to be issued will extend to the entire system but the lien of the outstanding bonds will have priority; the debt service or amortization account will be divided into two subaccounts, one for the presently outstanding bonds, which shall have first priority out of revenues, and one for the new bonds, which shall have second priority out of revenues; but that the operation and maintenance account, and the renewal and replacement account, will not be so divided.

■ The ordinance for the new bond issue provides that if any surplus accrues in the renewal and replacement account, and if the city decides to use it for the retirement of bonds, it must be used to retire *new* bonds. The appellants maintain that this provision impairs the "right" of the holders of the presently outstanding bonds to have their bonds retired out of such a surplus. The answer to this is that the holders did not have any such right. Prepayment of their bonds from such a surplus was a matter solely within the discretion of the city. The appellants do not suggest any respect in which the *security* of the outstanding bonds will be impaired, and of course the truth is that the security will be greatly increased since the lien of the bonds will attach to the new facilities. Prepayment of the new bonds instead of the old ones would seem to be a matter of good judgment, since the interest rate on the new bonds will be much higher than that on the old bonds.

■ The ordinance under which the presently outstanding bonds were issued authorized the issuance of additional bonds, to have the same priority, and the extension of maturity dates on bonds issued under that ordinance. The ordinance providing for the new bond issue prohibits the issuance of any additional bonds under the former ordinance, or the extension of maturity dates of bonds issued under that ordinance. The appellants complain of this provision but do not point out how it could impair the rights of the holders of the presently outstanding bonds. It seems to us that the provision in question would work to the advantage of the holders of the outstanding bonds, rather than to their disadvantage, because the issuance of additional bonds would dilute their security and the extension of maturity dates would postpone their right to collect the principal.

■ The appellants argue that the proposed plan is not economically sound, that the debt requirements will be so great that the system will be unable to meet them, and that the entire plan depends solely upon the financial ability of Big Rivers; wherefore the rights of the holders of the presently outstanding bonds are impaired by the dan-

ger of the system's going bankrupt. We find no merit in this argument. The evidence warrants a finding that the plan is economically sound. Furthermore, the Public Service Commission of Kentucky has in effect found the plan to be sound by issuing a certificate of public convenience and necessity for the new facilities. It may be that there is some element of risk in the plan, but, as we said in Bennett v. City of Mayfield, Ky., 323 S.W.2d 573, in approving the issuance by Mayfield of $9,500,000 in bonds for construction of an industrial plant to be leased to private industry:

"These and like possibilities of failure of the undertaking are present in every venture which looks to the future. Such constitute reasonable and calculated risks of business. It is to be remembered we are dealing here with a proprietary venture on the part of the city which has been sanctioned by the Legislature. Incidents of municipal proprietary functions should not be hampered by too stringent judicial construction or review. A more liberal regard may be had for contingencies or possibilities than where a city and its taxpayers may suffer some financial loss. At any rate, we may observe analogously that no machine will work if its bearings are too tight."

As hereinbefore stated, the ordinance for the new bond issue provides that from the revenues of the unified system an amount sufficient to meet debt-service requirements on both the old and the new bonds (the old ones having priority) must be set aside before deposits are made to the operation and maintenance account and the renewal and replacement account. The appellants complain that by so giving priority to debt-service on the new bonds, over operation and maintenance requirements, and renewal and replacement requirements, the ordinance impairs the security of the presently outstanding bonds, because sufficient funds to keep the system in good operating condition may not remain available after setting aside the amount needed for debt-

service on the new bonds. We think there is no real substance in this ground of complaint. The purpose of requiring sums to be set aside for operation and maintenance and for renewal and replacement is to insure that the revenues of the system, after meeting debt-service requirements, will not be diverted to general city purposes until provision has been made to keep the system in good shape. The concern of the bondholders is not that there will not be enough revenues to begin with to keep the system in good condition, but that the revenues will be diverted. The new ordinance contains full protection against diversion. The holders of the outstanding bonds would be hurt only if the unified system did not produce enough revenue to meet debt-service requirements and to keep the system in good shape. If there were any real danger of this, the plan would have to be considered economically unsound and be rejected by the courts on that ground. But there is ample evidence that the plan is economically sound.

The appellants argue that the rights of the holders of the presently outstanding bonds are somehow impaired by the mere fact that the new plan will in effect put a second mortgage on the existing plant. There is nothing in the original bond ordinance to prohibit the city from putting a second mortgage on the plant, and we are not aware of any common-law restriction against it.

Several grounds are asserted by the appellants on which they claim the proposed contract between Henderson and Big Rivers is *ultra vires*.

The contract for sale of surplus capacity to Big Rivers will have a base period of 30 years, but the contract will terminate sooner when and if the allocation of surplus capacity to Big Rivers becomes zero. The contract provides that the city shall allocate the amount of surplus capacity that Big Rivers is to receive, on the basis of five years' advance notice. This means in substance that the amount of surplus capacity

allocated to Big Rivers can be reduced only on five years' notice (except for standby or reserve requirements).

The contract further provides that at no time during the life of the contract will the city have the right to accept any new commercial or industrial customer having a load demand of 10,000 kilowatts or more (unless the city should build additional generating facilities to meet that load).

A further provision of the contract is that if, by reason of a good faith overestimate of the city's needs, the city has at any time surplus capacity over and above that allocated to Big Rivers, the latter has the option to take it at cost, and the city cannot resell any generating capacity to a third party except such as comes within the option clause and is not taken by Big Rivers.

Also contained in the contract is a provision giving Big Rivers "first refusal" in the event the city decides to sell the new generating facilities.

█ The appellants argue that the foregoing provisions of the contract are ultra vires because they create unauthorized restrictions on the city's use and control of its property and amount to a surrender of the city's sovereign powers. We think, however, that the provisions are simply matters of practical business decisions in carrying out a proprietary function, and that they create no significant limitations on the city's powers.

As respects the five-year-notice provision, there is evidence that this is a standard and customary provision in contracts between utilities for the sale of surplus power; it is necessary in order that the purchasing utility may plan for its future needs; and that the city is not under any practical limitations because the city's load growth in any five-year period is reasonably predictable and the city can reserve at the outset the capacity needed to meet that growth.

The restriction against the city's adding any new customers having a load demand of 10,000 kilowatts or more was testified to be necessary to give Big Rivers stability in its planning for its future needs and to give Big Rivers inducement to agree to purchase the surplus capacity of the city's system. Also, there was testimony that the largest present customer of the city's system uses only 2,000 kilowatts and that there is little probability that any plant needing 10,000 kilowatts ever would locate in the city.

The options given Big Rivers seem to us to be mere details of a practical business arrangement. Obviously, if the city is to obtain the advantage of being able to sell its surplus capacity during the period that the city's load requirements are growing to meet the capacity that the city in prudent anticipation has provided for, the city must be able to have some freedom of contract as to the terms and conditions of the sale. Sales options for property held in a proprietary capacity have been held valid. See Bennett v. City of Mayfield, Ky., 323 S.W.2d 573.

Our ultimate conclusion is that the judgment of the circuit court is correct in all respects.

The judgment is affirmed.

EDWARD P. HILL, Jr., C. J., and MILLIKEN, PALMORE and STEINFELD, JJ., concur.

OSBORNE, NEIKIRK and REED, JJ., dissent.

OSBORNE, Judge (dissenting).

I must dissent from the majority opinion in this case. I believe it is 180° wrong on every single issue presented. This case involves issues which are of vital importance to the general public, and these issues are obviously incorrectly determined by this opinion. It is apparent that this opinion

will be of some concern to future legal scholars.

This is a declaratory judgment proceeding brought by a citizen of Henderson seeking a declaration of rights of the parties with respect to passage of two ordinances by the city of Henderson on August 27, 1970. These ordinances authorize the execution of three contracts between the City and the Big Rivers Rural Electric Cooperative Corporation. This proceeding seeks approval of the issuance of $76,000,000 of additional electric light and power revenue bonds to finance the construction of the generating facility. To place this project in perspective one must first look at the history of Henderson relating to the production and distribution of electric power. On October 4, 1954, the City adopted an ordinance authorizing the issuance of electric light and power revenue bonds for the purpose of refunding all prior bonds then outstanding and to make certain extensions and improvements in the electric system. This ordinance was submitted to the people and approved in a referendum on November 2, 1954. Thereafter, on December 17, 1965, and again on May 22, 1968, the City authorized two additional issuances of revenue bonds for the purpose of providing extensions and improvements to its electric system. As a result of these actions there is now outstanding a total of $7,045,000 of these issues. There is no delinquency, the City having made payments as required by the bonds. As a result the City has a first-rate electrical system and facilities to generate 48,000 kilowatts, which is adequate to take care of its present demands. It, also, has agreements with other interconnecting generating facilities to acquire an additional 44,000 kilowatts in case of an emergency. In fact, in this year of 1970, Henderson has a peak load of 34,800 kilowatts as compared to its generating capacity of 48,000 kilowatts. This record is replete with ridiculous testimony and allegations concerning what the future requirements of the City will be. All estimates of future growth rate are based on recent past growth rates and some of these projections run as far as thirty years. This is speculation of the highest order and not the type of evidence upon which large public debts should be incurred. No man knows with any degree of certainty what will be the population of Henderson twenty years hence. It could possibly be less than it is today. On the basis of this most speculative testimony it is proposed in this action that this small City, which has an adequate electrical system, issue $76,000,000 worth of revenue bonds and construct a generating facility of 350,000 kilowatts. When the law is clear and unambiguous that this facility cannot be constructed nor these bonds issued unless the *primary purpose of the project is to furnish and supply the City and its inhabitants with electrical power*. Miller v. City of Owensboro, Ky., 343 S.W. 2d 398; KRS 96.520. Now, it so happens under the above statute and under the above authority that if the City in performing its primary function of providing its citizens with electrical power incidentally has some little power left over it may dispose of this surplus through private sale. Therefore, the city of Henderson, which, when this facility is constructed, will have a generating capacity of 398,000 kilowatts and will have for sale 363,000 kilowatts. This figure is determined by deducting 34,800 kilowatts, which is Henderson's peak load capacity for 1970. These figures make it so obvious that the primary purpose of the construction of these facilities is to furnish power to Big Rivers that I am amazed, appalled and confounded that this court could reach a contrary conclusion.

Since there are those who will wonder why this plant is being financed in this manner, it should be explained here that the income from revenue bonds issued by the city of Henderson is tax free to the bondholder, therefore, the bonds are more readily salable on the market than would be a private bond issued by Big Rivers. Furthermore, being municipal bonds, they will sell at a smaller interest rate on the market.

The most serious criticism of the plan is that Big Rivers, a private corporation, is

borrowing money on the credit of the people of the city of Henderson in direct violation of section 179 of the Constitution of Kentucky, which provides "The General Assembly shall not authorize any county or subdivision thereof, city, town or incorporated district, to * * * obtain or appropriate money for or to lend its credit to any corporation, association or individual * * *."

The majority opinion in an attempt to justify its conclusion states that expert engineers testified that a facility should have sufficient *firm* capacity to meet its load requirements, which means the facility must have standby or reserve capacity of its largest generating unit. The majority opinion points out that the facility proposed here consists of two units of 175,000 kilowatts each. That one unit can be justified under the Owensboro case, supra, and therefore, since good practice requires a standby capacity equal to the largest generating unit, then the other 175,000 kilowatt unit is justified. This reasoning is faulty on two grounds. First, the court takes into consideration the sale of surplus electricity in justifying the first 175,000 kilowatt unit. It was never intended that the sale of surplus electricity be used to justify the initial size of the unit. In determining the initial size of the unit only the needs of the city should be considered. Secondly, if a generating facility is being constructed to serve a city the size of Henderson, no competent engineer would recommend the use of units of 175,000 kilowatts. Smaller units could be used. Even if you were constructing a unit with a total capacity of 350,000 kilowatts, there is no reason why the plant could not be constructed with seven 50,000 kilowatt units, instead of two 175,000 units.

It is obvious from the way the system was designed and the questions presented to this court that we are being required to play with a stacked deck.

The second major objection is made by the bondholders. The plan submitted incorporates the original facilities now owned by the City into the new facility, the total of which is leased to Big Rivers. At present, there is approximately $7,000,000 in revenue bonds outstanding against the existing system. These bonds are seriously impaired in my opinion. Without going into lengthy detail as to how the rights of these bondholders are being impaired, I will only point out the fallacy in the reasoning of the majority opinion. The majority acknowledges that the contract between the original bondholder and the City is materially changed. It permits and justifies this change on the basis that the "security" of the outstanding bonds are not being impaired, because the evidence warrants a finding that the plan is economically sound. It is my opinion that any first-year law student could see the fallacy in this reasoning. For instance, if $X$ mortgages a cow to $Y$ and provides that in the event the mortgage payments are not made, $Y$ can milk the cow. Then, later, $X$ could not unilaterally substitute a mule for the cow and have this justified by a court of law on the basis that the mule is worth as much as the cow. What became of the milking rights? Where is the old concept of not impairing the obligation of a contract? To say that the old bondholders still have sufficient security is no answer. They have no assurance that the bonds will be as readily and promptly paid from revenues from the system as were the old bonds. Their system which had a known performance record and a known potential with a foreseeable future has been taken and incorporated into a system with many unknowns. Their assurance that next week's and next month's bond payments will be made as were last week's and last month's has been impaired. In short, it has been made nearly impossible for them to milk the cow. The cow has been incorporated and lost in a herd.

I am not convinced that the Owensboro case is legally sound but it is too late to attack that opinion at this time. Money has been invested. People have changed the course of doing business. Bonds have been

sold and so, right or wrong, the Owensboro case is law. I believe it would be a serious mistake to extend it beyond its original scope. I believe it would be catastrophic to extend it to the extent that this opinion does.

For the foregoing reasons, I respectfully dissent.

NEIKIRK and REED, JJ., join in this dissent.