Julius C. MILLER, etc., et al., Appellants,

v.

CITY OF OWENSBORO, Kentucky, et al., Appellees.

Court of Appeals of Kentucky.

Feb. 17, 1961.

Clarence McCarroll, Woodward, Bartlett & McCarroll, Owensboro, for appellants.

William T. Carroll, Gant & Carroll, Morton Holbrook, Sandidge, Holbrook, Craig & Hager, Owensboro, for appellees.

CULLEN, Commissioner.

This action was brought by persons suing as and on behalf of taxpayers and holders of electric plant revenue bonds of the City of Owensboro, raising questions as to the legality of a plan of the city for the construction, financing and operation of a new generating station. The circuit court entered a declaratory judgment upholding the legality of the plan and the plaintiffs have appealed.

The city now owns an electric plant, which was acquired and financed under the revenue bond plan provided for in KRS 96.520 to 96.540 (which incorporate by reference KRS 96.360 to 96.510), and there are outstanding revenue bonds against the plant. The capacity of the plant is only 22,500 KW, whereas the requirements of the city and its inhabitants are in excess of 40,000 KW. To supply the deficit the city has been purchasing power from Kentucky Utilities Company. The needs for power are increasing at the rate of 8.11 percent per year. There is space at the present plant for one more generator, of limited capacity, but the adding of this generator would not give the plant the capacity to meet the expanding needs after the year 1968.

The plan of the city is to construct a new generating station, outside the city, with an initial capacity of 125,000 KW and with space for an ultimate capacity of 800,000 KW. This station would not replace the existing plant but would be in addition thereto. The city would enter into a contract with Kentucky Utilities Company, with a 30-year term subject to cancellation by the city at the end of 10 years, for the sale to that company of the surplus energy from the station remaining after the needs of the city and its inhabitants have been met. The station would be financed by a $30,000,000 revenue bond issue which would be a lien on the entire plant but inferior to the lien of the bonds now outstanding against the existing plant, which latter lien would extend to the new station as well. The financing would be under authority of KRS 96.520 to 96.540.

The first contention of the appellants is that the plan is not within the authorization of KRS 96.520 and therefore the city will be in the position of creating claims against itself under contracts made

without express authority of law, in violation of Section 162 of the Kentucky Constitution. This is on the theory that KRS 96.520 authorizes a city to acquire and operate an electric plant only "for the purpose of supplying the city and its inhabitants" with electric energy, and that the purpose of the Owensboro plan is primarily to supply Kentucky Utilities Company with energy and only secondarily to supply the city and its inhabitants.

The facts do not support the contention that the plan is primarily for the benefit of Kentucky Utilities Company. To the contrary, the record establishes to our complete satisfaction that the purpose of the plan is to provide, on the basis of a reasonable anticipation of future needs, a plant adequate to supply the energy demands of the city and its inhabitants for a substantial period of years; that it is a matter of sound economic planning to provide initially for a surplus capacity rather than to add to the plant on a piecemeal basis as the needs from time to time arise; that while the surplus capacity of the proposed new station will be substantial, the surplus will gradually diminish and within fifteen years it is probable that the entire capacity will be needed for city consumers; and that the sale of the surplus to Kentucky Utilities Company is an advantageous means of realizing a return on the excess capacity rather than letting it constitute an economic loss.

In McGee v. City of Williamstown, Ky., 308 S.W.2d 795, it was recognized that a city may acquire property in contemplation of such reasonable necessity as may arise in the future. There it was held that a city, in condemning land for a reservoir, could base its determination of the amount of land necessary to be taken upon an estimate of the city's water requirements over a 30-year period in the future.

It being established that the primary purpose of the new station is to provide adequate facilities to meet the present and anticipated energy needs of the city and its

inhabitants, the mere sale of the current surplus of energy to persons outside the city does not result in a violation of the statute nor is it beyond the scope of a proper public purpose of the city. Sale of surplus production of city-owned utilities to nonresidents has been upheld in numerous decisions. See City of Henderson v. Young, 119 Ky. 224, 83 S.W. 583; Rogers v. City of Wickliffe, 94 S.W. 24, 29 Ky. Law Rep. 587; Board of Commissioners of Louisville Extension Water District v. Yunker, Ky., 239 S.W.2d 984; Louisville Water Company v. Public Service Commission, Ky., 318 S.W.2d 537; City of Cold Spring v. Campbell County Water District, Ky., 334 S.W.2d 269.

█ It is true that it has been held that a city cannot construct facilities outside of the city for the purpose of transmission of power or water to nonresidents, in the absence of a statute authorizing the extension of service to such nonresidents. See Dyer v. City of Newport, 123 Ky. 203, 94 S.W. 25; Smith v. City of Raceland, 258 Ky. 671, 80 S.W.2d 827; Board of Commissioners of Louisville Water Extension District v. Yunker, Ky., 239 S.W.2d 984; Louisville Water Company v. Public Service Commission, Ky., 318 S.W.2d 537. But here the City of Owensboro is not proposing to construct any transmission facilities to serve Kentucky Utilities Company. Whether the production plant is located within the city or outside it could make no difference as far as concerns the validity of the expenditure for the plant, so long as the basic purpose of the plant is to serve the city and its inhabitants. The situation is comparable to that in City of Cold Spring v. Campbell County Water District, Ky., 334 S.W.2d 269, where the City of Cold Spring constructed a water main a distance of two and a half miles beyond its limits in order to receive water from Covington, and the main was larger than necessary to serve the immediate needs of Cold Spring. It was held that the city could sell surplus water from the main to

residents of a small community along the main.

We conclude that the plan in issue does not violate KRS 96.520 or Section 162 of the Constitution.

■■ The second contention of the appellants is that the contract with Kentucky Utilities Company constitutes a "franchise" within the meaning of Section 164 of the Kentucky Constitution and is invalid because it extends beyond the maximum 20-year term authorized by that section. This contention has no merit because even if it be considered that the contract is the equivalent of a lease of the plant, the principle is firmly established that a lease of property owned by a city in a proprietary capacity does not constitute a franchise within the meaning of the Constitution. Board of Councilmen of City of Frankfort v. Pattie, 227 Ky. 343, 12 S.W.2d 1108; Inland Waterways Company v. City of Louisville, 227 Ky. 376, 13 S.W.2d 283; Faulconer v. City of Danville, 313 Ky. 468, 232 S.W.2d 80, 81. The fact that the city has the right to cancel the contract after 10 years is another reason why the contract could not violate Section 164. See Deters v. City of Louisville, Ky., 249 S.W.2d 796.

■■ The third contention is that the contract with Kentucky Utilities Company constitutes a lending of the credit of the city in violation of Section 179 of the Kentucky Constitution. This again is on the theory, which we have rejected, that the plant is being constructed for the principal benefit of Kentucky Utilities. But even so, the rule is well established that the issuance of revenue bonds to finance a public project, even such projects as an industrial building to be rented to private industry, does not constitute a lending of credit in violation of the Constitution. Faulconer v. City of Danville, 313 Ky. 468, 232 S.W. 2d 80; Bennett v. City of Mayfield, Ky., 323 S.W.2d 573. And in Dyche v. City of London, Ky., 288 S.W.2d 648, it was held

that even the use of *voted* bonds backed by the tax resources of the city, to construct an industrial plant for lease to private industry, did not constitute an invalid lending of credit.

■ A fourth contention is that the financing plan violates KRS 96.400 (which is adopted by reference in KRS 96.520 so as to make it a part of the governing statute under which the city is proceeding). The proposed bond ordinance provides that there will be set aside, out of the proceeds of the sale of the bonds, three reserve funds of $500,000 each, one for operation and maintenance expenses of the new station, one for a coal reserve account, and one for additions and replacements. KRS 96.400 prescribes that all moneys received from the sale of bonds "shall be applied solely for the purchase, establishment or erection" of the plant "and extensions and appurtenances thereto". It is contended that the proposal to place some of the proceeds of the bonds in the specified reserve accounts, particularly the ones for operation and maintenance and for coal reserve, violates the statute. Reliance is placed on Dailey v. Smith's Adm'x, 297 Ky. 689, 180 S.W.2d 861, where it was held that a city which had issued revenue bonds for extensions to its electric plant could not use some of the bond proceeds to pay debts previously incurred by the city in the operation of the plant. However, in that case the principal basis for the decision was that such use of the money constituted a violation of the bond ordinance and the contract with the bondholders. Here the bond ordinance and the contract with the bondholders will expressly provide for setting up the reserve funds. It seems to us that if the bondholders are agreeable to such use of the bond proceeds there is no basis for objection from any other source. We see no way in which it could be detrimental to the interests of the city. It must be remembered that this is a revenue bond plan that does not obligate any tax funds, and it involves a proprietary function that could not impair the carrying on

of the essential governmental functions of the City. See Bennett v. City of Mayfield, Ky., 323 S.W.2d 573.

It is our opinion that the setting up of reserves reasonably necessary to put the plant on a sound operating basis may be considered to be an element of "establishment" of the plant within the meaning of the statute. This interpretation is not contrary to any established legislative policy, for in KRS 96.800 (the "TVA Act") there is express authority given to use bond proceeds to create a cash working fund.

■ The fifth contention is that a provision of the proposed bond ordinance with reference to future reserves for replacements, renewals, extensions or additions violates the contractual rights of the holders of the existing bonds against the present plant. The ordinance under which the existing bonds were issued provides that there shall be set aside annually a sum equal to not less than four percent of the gross book value of the entire plant, as a reserve for replacements, renewals, etc. The proposed ordinance for the new station provides that such fund, computed on the book value of the *existing* plant only, shall continue to be set aside as a reserve for replacements, etc., to the existing plant only, and that there shall be maintained a separate reserve of $200,000 for replacements, etc., to the new station only. The appellants maintain that for some reason (which they do not disclose) this will violate the rights of the existing bondholders.

We do not see how the provisions of the new ordinance with reference to the reserves possibly could impair any rights of the existing bondholders. In the first place, they are acquiring as a sort of windfall an additional security in the form of a first lien on the new station. Furthermore, even if there should be set aside, as they apparently contend, a reserve equal to four percent of the book value of the entire system (including the new station)

as a reserve for replacements, etc., for the entire system, the existing bondholders would have no contractual right to designate on what part of the plant the reserve should be expended. There could not be any income impairment because the reserve provided for the new station is less than would have to be set aside under the terms of the original ordinance. Actually, the fact that the proposed separate reserve for the new station will be substantially less than would have been required under the terms of the original ordinance should be of benefit to the existing bondholders because it will make more certain that there will be adequate funds available from the revenues to set aside the required reserve for the existing plant. If it should be required that the total reserve include four percent of the value of the new station (possibly $1,200,000 a year on a value of $30,000,000) it would seem that the existing bondholders would have better cause to complain, because of the heavy load imposed on the income to meet the reserve requirements for the new station.

■ The final contention is, in substance, that the proposed plan for the new station is economically unsound; that the sinking fund requirements will be so great that the system may not be able to meet them; and as a result the ability of the city to meet the payments on the existing bonds will be impaired.

There are a number of answers to this contention. First, there are in the record reports of competent engineers, supported by factual studies, showing that the plan is financially sound. Second, the city has a firm contract with Kentucky Utilities Company that will insure definite revenues from the new station. And third, the new bond ordinance provides that the sinking fund requirements for the existing bonds have complete priority over those for the new bonds.

The judgment is affirmed.