STATE ex rel. Charles M. MITCHELL and Don C. Diven, Relators,

v.

CITY OF SIKESTON, Missouri, a Municipal Corporation, and City of Trenton, Missouri, a Municipal Corporation, Respondents.

No. 59963.

Supreme Court of Missouri, En Banc.

Sept. 12, 1977.

George W. Gilmore, Jr., Sikeston, Allan D. Seidel, Trenton, for relators.

Manuel Drumm, Sikeston, Lawrence M. Berkowitz, Kansas City, for respondents.

James C. Swearengen, Jefferson City, amicus curiae.

BARDGETT, Judge.

This is an original proceeding in the nature of quo warranto brought by the relators, Charles M. Mitchell and Don C. Diven, resident taxpayers and ratepaying users of the municipal electric systems of Sikeston and Trenton, Missouri, respectively. They were authorized to bring this action on behalf of the state by the attorney general. Relators instituted this action against respondents city of Sikeston and city of Trenton, both municipal corporations organized and existing as cities of the third class under the laws of the state of Missouri. Jurisdiction is in this court pursuant to art. V, sec. 4, Mo.Const.

The facts in this case have been stipulated by the parties. Sikeston in the past has purchased most of its electric power and energy needs from the Southwestern Power Administration (SPA) of the U. S. Department of Interior. SPA has informed Sikeston that the present supply contracts will not be renewed as they expire. This means that by 1986 the SPA's supply of power to Sikeston will be practically terminated.

In order to determine what it should do to provide for its future energy needs, Sikeston employed Phelps & Hogland Engineering Co. of Raytown, Missouri, to advise the city of available alternatives. Phelps & Hogland prepared a "Feasibility Study" which stated its findings and recommendations. They found that Sikeston presently has an electric power requirement of approximately 40,000 kilowatts (kw), and this requirement has been increasing at over 9% per year. The present generating capacity is 15,000 kw which, according to Phelps & Hogland, is inadequate to meet the present and future needs of Sikeston. Furthermore, because of the reduction in the supply of power from the SPA, and the expected continued growth of Sikeston's energy needs, it is necessary to find a new source of power for immediate and future requirements. The "Feasibility Study" concluded that the most economical and reliable means of supplying the increasing electrical needs of Sikeston was to build a large coal-fired steam generating plant and sell the surplus electric power and energy to other municipalities until Sikeston can utilize the entire output of the plant. It is projected that Sikeston will be utilizing the plant's capacity in approximately 20 years.

Pursuant to the recommendations of the "Feasibility Study", Sikeston has proposed to issue and sell up to $250,000,000 of Electric System Revenue Bonds (bonds) to pay the cost of purchasing and constructing a 235,000 kw coal-fired steam-electric generating plant to be owned exclusively by Sikeston. The proposition to authorize the bonds was passed by the voters of Sikeston at the general election of November 2, 1976.

The plan for construction of this generating plant calls for it to be completed and put into operation by June 1, 1981. Recognizing that it will not be using the plant's entire output immediately, Sikeston plans to sell the surplus power during the 20-year period to eight other municipalities in Missouri, one of which is respondent city of Trenton, and to the Associated Electric Cooperative, Inc. (AEC).

Sikeston has entered into a cooperation agreement with the purchasing municipalities for the purpose of providing electric service to these cities and their inhabitants. This agreement provides that Sikeston will finance, construct, own, and operate the project and will provide and sell surplus electric power to the purchasing municipalities which will purchase the same. In furtherance of the cooperation agreement, Sikeston and the city of Trenton have entered into a "power sales contract" dated December 1, 1976, which calls for the city of Trenton to purchase power from the city of Sikeston over a term of years. Substantially identical contracts were entered into with each of the other purchasing municipalities and the city of Sikeston. The

length of each contract and the amount of power to be purchased vary with each purchasing municipality. All of the contracts are on a "take-or-pay" basis, meaning the purchasing municipalities would be obligated to pay for the power they have contracted to purchase regardless of whether they actually take and use the power and regardless of whether the power is available from the project. The obligations of the purchasing municipalities would be payable only from the revenues of their respective municipal electric systems and not from any tax revenues or general revenues of the municipalities.

Sikeston and AEC have executed a "letter of intent" in which they propose to enter into a "power sales, interconnection and operating agreement". This agreement provides that AEC will purchase from Sikeston on a "take-or-pay" basis a portion of the temporary surplus output of the project. AEC also agreed to provide transmission services for the purchasing municipalities and standby power at such times as the project is out of service.

The aggregate revenues under the contracts with the municipalities and AEC are projected to be sufficient to pay the principal and interest on the bonds over the life of the bond issue. In addition Sikeston intends to set aside, out of the bond proceeds, reserve funds to provide for start-up operating expenses, acquisition of initial fuel inventory, initial debt service reserve requirements, and a reserve for renewals, replacements, and contingencies.

The relators challenge the authority of Sikeston and the purchasing municipalities to proceed with this project. The relators raise the following issues: (1) the construction of a power plant greatly in excess of the current needs of Sikeston violates the requirement that a city act only in furtherance of proper "public municipal purposes" because it only incidentally serves the residents of Sikeston, (a) Sikeston has exceeded the scope of its statutory authority to supply the city and its inhabitants with electric power, (b) a project of this size is not a proper area for municipal action in the ab-

sence of specific legislative authority, (c) the project is a venture into a field of private business which is not a proper municipal purpose; (2) the issuance of the bonds and the sale and purchase of a portion of the output of the project violates secs. 23 and 25, art. VI, Missouri Constitution, which prohibit cities from lending their credit or granting public money or property to any private individual, association, or corporation; (3) the funding of reserves and start-up expenses for the project is an unauthorized use of bond proceeds; (4) the "power sales contracts" create an "indebtedness" of the purchasing municipalities in violation of art. VI, sec. 26(a), Missouri Constitution; and (5) the purchasing municipalities have violated art. VI, sec. 27, Missouri Constitution, because they entered the "power sales contracts" without first securing voter approval.

■ The first issue raised by relators is whether Sikeston's act of constructing a power plant greatly in excess of its present needs is a proper public municipal purpose. It is a basic principle of municipal law that public funds may be expended only for proper public municipal purposes. *Dysart v. City of St. Louis*, 321 Mo. 514, 11 S.W.2d 1045 (Mo. banc 1928); *State ex rel. City of Jefferson v. Smith*, 348 Mo. 554, 154 S.W.2d 101 (Mo. banc 1941). The test of whether a public purpose is being served was stated in *Dysart* at 1047:

"But, though the principle that taxes may be levied for public purposes only is one of universal acceptance, its application is often difficult. What constitutes a public use is not easy to define. *State v. Orear*, 277 Mo. 303, 210 S.W. 392; *Halbruegger v. St. Louis*, 302 Mo. 573, 262 S.W. 379. It is said: 'In deciding whether, in a given case, the object for which the taxes are assessed falls on the one side or the other of this line, the courts must be governed mainly be the course and usage of the government, the objects for which taxes have been customarily and by long course of legislation levied, what objects or purposes have been considered necessary to the support and for

the proper use of the government, whether state or municipal. Whatever lawfully pertains to this and is sanctioned by time and the acquiescence of the people may well be held to belong to the public use, and proper for the maintenance of good government, though this may not be the only criterion of rightful taxation. * * Perhaps the best test of rightful taxation is that the proceeds of the tax must be used for the support of the government or for some of the recognized objects of government, or directly to promote the welfare of the community. It may also be conceded that that is a public purpose from the attainment of which will flow some benefit or convenience to the public. In this latter case, however, the benefit or convenience must be direct and immediate from the purpose, and not collateral, remote or consequential. It must be a benefit or convenience which each citizen of the community affected may lay his own hand to in his own right, and take unto his own use at his own option, upon the same reasonable terms and conditions as any other citizen thereof.' 26 R.C.L. 46."

■ "It is well settled that the legislature where not forbidden by the constitution, has power to authorize a municipal corporation to own and operate any public utility such as is generally owned and operated in a city by public service corporations, for the purpose of supplying not only its needs [government's] but also those of the inhabitants or residents of the municipality." 12 McQuillin, Municipal Corporations, sec. 35.04, p. 396 (rev. ed. 1970); *Lockhart v. Kansas City*, 351 Mo. 1218, 175 S.W.2d 814 (Mo. 1943). In Missouri, municipalities are authorized to construct energy plants and supply energy pursuant to sec. 91.010, RSMo 1969. Furthermore, sec. 91.020, RSMo 1969, authorizes municipalities to sell to other municipalities, while sec. 91.030, RSMo 1969, allows other municipalities to purchase power from vendor municipalities. There is also no question that a municipality may sell surplus power to nonresidents or other municipalities without violating the proscription against expending public funds

for other than public purposes. *Taylor v. Dimmitt*, 336 Mo. 330, 78 S.W.2d 841 (Mo. 1934); *Speas v. Kansas City*, 329 Mo. 184, 44 S.W.2d 108 (Mo. 1931).

In *Speas* the court concluded that a Kansas City charter provision which allowed the city to sell surplus water to nonresidents did not conflict with the public purposes doctrine. The court said at 113:

". . . However, Kansas City is authorized by sections 8 and 11 of article 1 of its charter to acquire and to operate waterworks for public purposes only, and the acquisition or operation of waterworks by it for purposes other than public purposes, even though so authorized by its charter, would be in violation of section 3 of article 10 of the Constitution of Missouri, which says: 'Taxes may be levied and collected for public purposes only.' Is the charter power of Kansas City to supply water to nonresidents in conflict with its charter power to acquire and to operate waterworks for public purposes only or with the constitutional provision that taxes may be used for public purposes only? We think not, because the charter power of Kansas City to supply water to nonresidents may be exercised, as was doubtless intended by the framers of its charter, for the benefit of the city and its inhabitants. In other words, if Kansas City acquired and is operating its waterworks primarily for the purpose of supplying water for its own needs and the needs of its inhabitants, and is incidentally selling surplus water to nonresidents, without impairing the usefulness of its waterworks for said primary purpose, such exercise of its charter power to supply water to nonresidents is not inconsistent with its charter power to acquire and to operate waterworks for public purposes only, nor with the constitutional provision that taxes may be used for public purposes only. In this conclusion, we are amply supported by rulings in other jurisdictions."

■ The issue presented by relators, therefore, is how much surplus can a municipality anticipate selling to other municipal-

ities when the former is constructing a power plant, without violating the public purposes doctrine. The relators argue that because of the large surplus, i. e., the large amounts of power available to the purchasing municipalities, the risk of financial failure borne by Sikeston, and the speculative nature of the projections contained in the "feasibility study", the primary benefit of this project is to the purchasing municipalities and not Sikeston. Relators cite only two cases, *Dysart v. City of St. Louis*, supra, and *State ex rel. City of Jefferson v. Smith supra*, to support their assertion that a municipality cannot sell a surplus of power of the magnitude proposed by Sikeston. Neither of these cases directly involved the issue present in the instant case.

*Dysart* involved a suit by a taxpayer to prevent the delivery of bonds voted by the taxpayers of St. Louis for the development of an airport. The plaintiff argued that an airport would not promote a public purpose because it would only serve a small minority of the residents. The court quoted the general language regarding public purposes and held the airport did serve a public purpose and the issuance of the bonds was authorized.

*State ex rel. City of Jefferson* was an action for mandamus to compel the state auditor to register bonds proposed by Jefferson City for the purpose of erecting an office building. This building was intended to house the state Unemployment Compensation Commission along with a few city offices. The court held this was not authorized because it was primarily for the benefit of the state and only incidentally for the municipality. The fact that the city intended to use a small portion of the building was only an incidental use intended to circumvent the public purposes requirement.

Respondents have directed the court's attention to two Kentucky cases, *Miller v. City of Owensboro*, 343 S.W.2d 398 (Ky. 1961), and *Wilson v. City of Henderson*, 461 S.W.2d 90 (Ky. 1970), which we find persuasive on this issue. In *Miller* the city of Owensboro proposed to construct a generating plant with an initial capacity of 125,000

kw and with space for an ultimate capacity of 800,000 kw. The plant they then owned had a capacity of 22,500 kw while the requirements of the city and its inhabitants were 40,000 kw. It was projected that the energy needs of Owensboro were growing at 8.11% per year. The city planned to enter into a 30-year contract with Kentucky Utilities Company to purchase the surplus energy after the needs of the city had been met. Like Missouri, Kentucky statutes provide for the sale of power by one municipality to another, but the plaintiffs contended that the sale of such an extensive surplus violated the public purpose doctrine. The court held, however, that the sale of the surplus in *Miller* did not violate the public purpose doctrine because the large size of the plant was premised upon the anticipated future needs of the municipality. The Kentucky court stated at 401:

"The facts do not support the contention that the plan is primarily for the benefit of Kentucky Utilities Company. To the contrary, the record establishes to our complete satisfaction that the purpose of the plan is to provide, on the basis of a reasonable anticipation of future needs, a plant adequate to supply the energy demands of the city and its inhabitants for a substantial period of years; that it is a matter of sound economic planning to provide initially for a surplus capacity rather than to add to the plant on a piecemeal basis as the needs from time to time arise; that while the surplus capacity of the proposed new station will be substantial, the surplus will gradually diminish and within fifteen years it is probable that the entire capacity will be needed for city consumers; and that the sale of the surplus to Kentucky Utilities Company is an advantageous means of realizing a return on the excess capacity rather than letting it constitute an economic loss."

In *Wilson* the city of Henderson proposed to construct a power plant with two generating units, each with a capacity of 175,000 kw. The present requirements of the city were 34,820 kw and the present capacity of

the plant was 48,000 kw. The load-growth rate of Henderson was 10.98% per year and the evidence showed that within 20 years the firm capacity (175,000 kw) of the expanded plant would be needed by the city and within 30 years the capacity of the entire plant would be required. The city of Henderson agreed to sell the surplus to Big Rivers Rural Electric Cooperative Corporation. The court upheld this plan against the contention that it violated the public purpose doctrine, finding that Henderson's plan was not significantly different from the plan authorized in *Owensboro.*

The court holds that the plan proposed by Sikeston serves a public purpose and is primarily for the residents of the city of Sikeston. The relators would have us hold that because Sikeston may not need to use the capacity of this plant for 20 years and, during that period, plans to sell the surplus to others, it is not being constructed primarily for the benefit of Sikeston. Such a holding would compel Sikeston to build a plant that would be obsolete when it went on the line. During the oral argument, the *amici* power companies stated it is reasonable for power companies to anticipate power needs for 20 years when building a power plant.

In light of the evidence presented in this case by way of the "feasibility study", we find that Sikeston's plan does serve a municipal purpose. The "Summary of Findings and Recommendations" of the study show:

". . . [T]hat the most economical course of action is to build a large coal fired steam plant and sell the excess capacity and energy to other Municipal Utilities and Associated Electric Cooperative.

"The size generating unit should be 235 MW in order to keep future rate increases reasonable and the cost of power competitive enough to readily market the surplus power and energy.

"After evaluating the various courses of action, we recommend that a 235 MW coal fired generating plant be built contingent on obtaining suitable contracts with other Municipal Utilities and Associated Electric Cooperative for the purchase of surplus power and energy from the plant."

We are cognizant of the fact that individuals as well as communities are facing a crisis in the area of energy. Every day we are bombarded by this fact through the media and the daily costs of energy. Sikeston has confronted this problem by planning for its projected energy needs. That is the thrust of this project—not the incidental sale of energy to other municipalities. In order to supply energy economically and for an extended period of time, Sikeston had to build a plant larger than its present requirements. Furthermore, in order to make it initially economically feasible, it had to sell the surplus. The sale of the surplus is merely incidental to the need to plan for the future which we find serves a public purpose and primarily benefits the residents of Sikeston.

Relators next contend that Sikeston has exceeded the scope of its statutory authority in proposing to construct such a large plant. It is relators' contention that secs. 91.010 and 91.020, RSMo 1969, do not contemplate the building of a municipal power plant with such an extensive surplus of energy which in turn will be sold to others.

Section 91.010 provides: "The city council of any city, town or village in this state shall have power to erect, maintain and operate waterworks, or to acquire waterworks by purchase and to operate and maintain the same, and to supply the inhabitants thereof with water; to erect, purchase, acquire, maintain and operate gas and power plants, electric light plants, ice plants or any other kind of plant or device for lighting purposes, or to acquire and own the same by purchase and to maintain and operate such plants and to supply the inhabitants of such cities, towns and villages with water, light, ice and power therefrom"

Section 91.020 provides: "Any city in this state, which owns and operates any electric light or power plant, may, and is hereby authorized and empowered to, supply electric current from its light or power plant to

other municipal corporations for their use and the use of their inhabitants, and also to persons and private corporations for use beyond the corporate limits of such city, and to enter into contracts therefor for such time and upon such terms and under such rules and regulations as may be agreed upon by the contracting parties."

Section 91.030, RSMo 1969, authorizes other municipalities to purchase power from vendor cities.

■■■ Relators argue that, although sec. 91.020 authorizes the sale of power, it only grants the authority to sell "normal excess incident to carrying out the fundamental object of supplying the city and its inhabitants with light and power". Relators correctly cite two general principles of law: (1) that municipalities are creatures of statute and only have those powers granted to them by the legislature, and (2) courts have generally followed a strict rule of construction when construing the powers of municipalities. These rules were expressed in *Taylor v. Dimmitt, supra,* as follows:

". . . Even as to. governmental functions, Missouri cities have or can exercise only such powers as are conferred by express or implied provisions of law; their charters being a grant and not a limitation of power, subject to strict construction, with doubtful powers resolved against the city. 'It is a general and undisputed proposition of law that a municipal corporation possesses and can exercise the following powers, and no others: (1) Those granted in express words; (2) those necessarily or fairly implied in, or incident to, the powers expressly granted; (3) those *essential* to the declared objects and purposes of the corporation—not simply convenient, but indispensable. Any fair, reasonable doubt concerning the existence of power is resolved by the courts against the corporation, and the power is denied.'" 78 S.W.2d at 843.

Relators rely primarily on *Taylor* to support their argument that the proposed project is beyond the statutory authority conferred upon Sikeston. *Taylor,* however,

may be distinguished upon its facts. It involved a situation where the vendor municipality proposed not only to sell surplus power to nonresidents, but also to construct an electric transmission line outside the city. The parties conceded that the municipality had the power to sell the surplus energy but argued that the construction of transmission lines beyond the city limits was unauthorized. This court agreed holding that neither secs. 7642 nor 7643, RSMo 1929 (now secs. 91.020 and 91.030, RSMo 1969, respectively) authorized the vendor municipality to erect transmission facilities outside the city. Furthermore, sec. 7643 (91.030) explicitly gave this authority to the purchasing municipality, evidencing a desire on the part of the legislature to preclude vendor municipalities from this field.

■■■ Contrary to the situation in *Taylor,* we find that the plain meaning of sec. 91.010 gives a municipality the express authority to construct a power plant while sec. 91.020 gives a municipality express authority to sell power to others. There is no limitation in sec. 91.020 of the amount of power that a municipality can sell. Furthermore, no ambiguity is created by the language, "[a]ny city in this state, which owns and operates any electric light or power plant, may, and is hereby authorized and empowered to, supply electric current from its light or power plant to other municipal corporations . . . and also to persons and private corporations for use beyond the corporate limits of such city . . . ." This does not, however, allow a municipality to sell its entire power supply without providing for its own residents. It can only sell the excess over what its present needs are. 12 McQuillin, Municipal Corporations, sec. 35.33, pp. 454–455 (rev. ed. 1970). In *Miller v. City of Owensboro, supra,* and *Wilson v. City of Henderson, supra,* Kentucky held a statute similar to the one in the instant case did not foreclose the sale of a large surplus to others. The size of the Sikeston power plant is reasonably related to its present and predictable future needs. The point is overruled.

Relators next contend that the sale of energy on the scale proposed by this project is a matter of statewide concern and, as such, is not a proper area for municipal action in the absence of express legislative authority. We have already stated that sec. 91.020 grants municipalities the express authority to sell surplus power to other municipalities. Unlike the instant case where the municipality has been granted express statutory authority, all the cases cited by relators in support of their argument deal with situations where there was a local ordinance which was passed without express authority or which conflicted with a state statute. These cases merely recognize the rules that municipalities are limited to those powers granted them by the state, and where local ordinances conflict with state statutes the latter is paramount. This point is without merit since we have already determined that Sikeston has express authority to engage in this project.

■ Relators also contend that the exercise of extraterritorial powers by a municipality has always been a controversial subject. Furthermore, they argue, the legislature has enacted the Public Service Commission law to regulate private utility companies while there is no such framework for municipal corporations engaged in the same activity. According to relators, the inference to be derived from this is that the legislature had no idea that municipalities would be engaged in power projects comparable to the one proposed by Sikeston. Relators suggest that the enactment of the Public Service Commission law indicates that the legislature intended to preempt municipal corporations from acting in the area of extraterritorial delivery of electric service.

In *Public Service Commission v. City of Kirkwood*, 319 Mo. 562, 4 S.W.2d 773 (Mo. 1928), the PSC argued that before Kirkwood could supply water to residents outside its city limits it had to obtain a certificate of public convenience and necessity from the commission. The city had authority under secs. 9079 and 9083, RSMo 1919 (now secs. 91.010 and 91.050, RSMo 1969,

respectively) to erect, own, and operate a water supply system and to sell the water to nonresidents. The court held the PSC had no authority to compel Kirkwood to obtain a certificate of public convenience and necessity and, furthermore, the enactment of the Public Service Commission law did not act to repeal the powers granted municipal corporations under other statutes. The court holds that relators' contention is without merit because Sikeston has express authority to engage in the extraterritorial supplying of electric power.

■ Relators next contend this project is not a proper municipal purpose for Sikeston to undertake because it is a venture into private business. The question of whether a municipality is engaging in private business is not answered by simply determining if private businesses are engaged in the same activity. Relators quote extensively from *State ex rel. City of Excelsior Springs v. Smith*, 336 Mo. 1104, 82 S.W.2d 37, 39 (Mo. banc 1935), to support this general proposition. The court held, however, in that case that Excelsior Springs could equip, manage, and control the principal mineral springs and wells in that city without violating the private business proscription.

Relators once again cite *Taylor, supra*, and *Missouri Public Service Co. v. City of Trenton*, 509 S.W.2d 770 (Mo.App. 1974), for the proposition that Sikeston cannot engage in this venture. Both cases dealt with the power of a vendor municipality to build transmission facilities outside their corporate boundaries. They were decided on the basis that this power was not granted to vendor municipalities and not on the basis of the private business proscription as relators contend.

In *Bowman v. Kansas City*, 233 S.W.2d 26 (Mo. banc 1950), Kansas City proposed to use public funds to construct a parking garage. Plaintiffs challenged this on numerous grounds, one of which was that it violated the rule against municipalities engaging in private business. The court ruled against the plaintiffs saying at 35:

"The acquisition of land for and the establishment and operation of public off-street parking stations or garages by the defendant city being for a public use and for public purposes, the fact that such stations will compete with private enterprises is not material or decisive. It is well settled that, if it is in the public interest and for a public purpose, a city may be authorized by the state to engage in a business commonly carried on by a private enterprise; and in such case such city may levy a tax to support such business and compete with private interests engaged in a like activity. *Puget Sound Power & Lt. Co. v. City of Seattle,* 291 U.S. 619, 54 S.Ct. 542, 545, 78 L.Ed. 1025, rehearing denied 292 U.S. 603, 54 S.Ct. 712, 78 L.Ed. 1466."

As we have previously stated, the project proposed by Sikeston is in the public interest and for a public purpose. This type of project is also expressly authorized by the legislature. Furthermore, the sales of surplus power to other municipalities are only incidental to the service rendered the residents of Sikeston, i. e., power for the present and future, regardless of the fact the sales are projected to occur over a 20-year period. The court holds that this project does not violate the private business proscription.

 Relators next contend that the financing arrangement for this project constitutes a lending of credit by Sikeston as well as by the purchasing municipalities where each of these entities is contributing its credit to the others and to AEC through either the bonds or the power sales contracts. Relators assert this arrangement violates both secs. 23 and 25 of art. VI, Missouri Constitution.

Section 23 provides in part: "No county, city or other political corporation or subdivision of the state shall own or subscribe for stock in any corporation or association, or lend its credit or grant public money or thing of value to or in aid of any corporation, association or individual, except as provided in this constitution."

Section 25 provides in part: "No county, city or other political corporation or subdivision of the state shall be authorized to lend its credit or grant public money or property to any private individual, association or corporation except as provided in Article VI, Section 23(a) and except that the general assembly may authorize any county, city or other political corporation or subdivision to provide for the retirement or pensioning of its officers and employees and the widows and children of deceased officers and employees and may also authorize payments from any public funds into a fund or funds for paying benefits upon retirement, disability or death to persons employed and paid out of any public fund for educational services and to their beneficiaries or estates; and except, also, that any county of the first class is authorized to provide for the creation and establishment of death benefits, pension and retirement plans for all its salaried employees, and the widows and minor children of such deceased employees."

As authority for their contention, relators only quote the two constitutional provisions set forth supra. The weight of authority, however, is against the interpretation relators espouse. There are two lines of cases which support the constitutionality of the instant financing arrangement. The first is that there is no lending of credit where revenue bonds are payable solely from the revenue derived from the project and not from taxes. As to the argument that the purchasing municipalities are lending their credit, the relators argue this theory finds support in *New Liberty Medical & Hosp. Corp. v. E. F. Hutton & Co.,* 474 S.W.2d 1 (Mo.banc 1971). In that case a hospital district (the state entity) entered into a long-term lease to pay rentals which covered the principal and interest of debentures which in turn covered the cost of building and equipping a proposed hospital. The debentures were to be issued by a not-for-profit corporation which was set up to build, equip, and run the hospital.

As against the contention that this funding arrangement violated the sec. 25, art. VI, proscription against lending credit, the

court in *E. F. Hutton,* quoting from *State ex rel. Thomson v. Giessel,* 271 Wis. 15, 72 N.W.2d 577, 584 (1955), said that the purpose of this provision "is to prohibit the state from acting as a surety or guarantor of the collateral obligation of another party. It is the promise by the state as a guarantor to answer for the debt of another that is proscribed by the state constitution." 474 S.W.2d at 5.

In the instant case the purchasing municipalities have not agreed to act as guarantors of Sikeston's project. To the contrary, they have negotiated at arm's length to purchase power at certain rates to be paid out of the revenues produced in the purchasing municipalities from the sale of electricity alone. This does not violate the proscription against lending credit.

The same reasoning applies to Sikeston—it is not lending its credit to either the purchasing municipalities or AEC. The revenue bonds proposed by Sikeston are to be paid solely out of the revenues generated from the sale of electricity and not from money raised by taxation. The same contention raised by relators in the instant case was raised in *Miller v. City of Owensboro, supra,* and rejected. See also *People ex rel. City of Salem v. McMackin,* 53 Ill.2d 347, 291 N.E.2d 807 (Ill.1972), and *Allen v. Tooele County,* 21 Utah 2d 383, 445 P.2d 994 (1968).

■ The second theory under which the constitutionality of this funding arrangement may be sustained is that no violation of sec. 23 or 25, art. VI, Missouri Constitution, occurs where the expenditure of public funds is for a public purpose. *State ex rel. Farm Elec. Coop., Inc. v. State Env. I. A.,* 518 S.W.2d 68 (Mo.banc 1975); *State ex rel. City of Boonville v. Hackmann,* 293 Mo. 313, 240 S.W. 135 (Mo.banc 1922). In *State ex rel. Farm Elec. Coop.,* the relator challenged the constitutionality of secs. 260.005 through 260.090, RSMo Supp.1973, as violative of secs. 23 and 25, art. VI, Mo.Const. The statutes authorized the Environmental Improvement Authority to issue bonds to finance pollution control facilities which it in turn would lease or sell to private persons, firms, municipal corporations, etc. The bonds were to be paid for from the revenues derived from the sale or lease of the pollution control facilities. Dispensing with the challenge under secs. 23 and 25, art. VI, Mo.Const., the court said at 74, "[i]t has long been recognized in Missouri . . . that the constitutional prohibitions noted are not violated when money and property are expended or utilized to accomplish a 'public purpose'." The court has already concluded that this project serves a public purpose. For these reasons this point is overruled. See also · *Industrial Develop. Auth. of City of Pinal v. Nelson,* 109 Ariz. 368, 509 P.2d 705 (1973), and *People ex rel. City of Salem v. McMackin, supra.*

■ Relators' next point is that the funding of reserves and start-up expenses for the project is an unauthorized use of bond proceeds. Relators assert that the proceeds obtained from the issuance of revenue bonds may be used only for purposes both authorized by statute and approved by the voters. Relators concede that the use of the bond proceeds for the funding of reserves and start-up expenses was approved by the voters of Sikeston, but they claim this is not authorized by any statute. It is a general principle recognized in this state that a "constitutional grant to issue and sell revenue bonds carries with it by implication such other necessary powers as are needed to carry the granted authority into effect." *State ex rel. City of Fulton v. Smith,* 355 Mo. 27, 194 S.W.2d 302, 305 (Mo.banc 1946).

■ We agree with the Kentucky court in *Miller v. City of Owensboro, supra,* that the provision for a reserve fund and start-up expenses is reasonably necessary to carry out the authority granted, i. e., the construction of a power plant, because it is necessary to put the plant on a sound operating basis. Furthermore, we also agree with the court in *Miller* when it concludes that these provisions are part of the "establishment" of the plant. In other words, the provisions for a reserve fund and start-up expenses is an integral part of the municipalities power granted by sec. 91.010 to

"erect, purchase, acquire, maintain and operate gas and power plants, electric light plants, . . . ." The point is overruled.

Relators next contend the power sales contracts create an "indebtedness" on behalf of the purchasing municipalities in violation of art. VI, sec. 26(a) and (b), Mo. Const., because those contracts were not submitted for voter approval. Sec. 26(a) of art. VI, provides: "No county, city, incorporated town or village, school district or other political corporation or subdivision of the state shall become indebted in an amount exceeding in any year the income and revenue provided for such year plus any unencumbered balances from previous years, except as otherwise provided in this constitution." Sec. 26(b) of art. VI, provides: "Any county, city, incorporated town or village or other political corporation or subdivision of the state, by vote of two-thirds of the qualified electors thereof voting thereon, may become indebted in an amount not to exceed five per cent of the value of taxable tangible property therein as shown by the last completed assessment for state or county purposes, except that a school district by a vote of two-thirds of the qualified electors voting thereon may become indebted in an amount not to exceed ten per cent of the value of such taxable tangible property."

However, the obligation of the purchasing municipalities in this case is not an "indebtedness" within the terms of art. VI, sec. 26(a)(b) of the constitution. The general rule on what constitutes an "indebtedness" within the meaning of art. VI, sec. 26(a), was stated in *Scroggs v. Kansas City,* 499 S.W.2d 500, 502 (Mo. 1973), which quoted from *Grossman v. Public Water Supply Dist. No. 1,* 339 Mo. 344, 96 S.W.2d 701, 706 (1936):

"It has been held repeatedly in this state that the constitutional limitation imposed by section 12, article 10 of the Missouri Constitution on the indebtedness a political corporation may incur, contemplates a debt which must be paid directly or indirectly by resort to taxation. *State ex rel. Smith v. City of Neosho,* 203 Mo. 40, 82, 101 S.W. 99, 109; *Bell v. City of*

*Fayette,* 325 Mo. 75, 91, 28 S.W.2d 356, 361; *Hight v. City of Harrisonville,* 328 Mo. 549, 558, 41 S.W.2d 155, 158; *Hagler v. City of Salem,* 333 Mo. 330, 336, 62 S.W.2d 751, 754; *State ex rel. City of Hannibal v. Smith,* 335 Mo. 825, 833, 74 S.W.2d 367, 371; *Sager v. City of Stanberry,* 336 Mo. 213, 227, 78 S.W.2d 431, 438.

"It is likewise well established that the 'special fund doctrine' prevails in Missouri, and that an indebtedness of a city or other like political corporation payable only out of income derived from the property purchased is not a debt within the meaning of the above provision of the Constitution. *State ex rel. City of Excelsior Springs v. Smith,* 336 Mo. 1104, 1112, 82 S.W.2d 37, 40; *State ex rel. City of Hannibal v. Smith, supra,* 335 Mo. 825, loc.cit. 834, 74 S.W.2d 367, loc.cit. 371. But if the special fund pledged to the payment of the debt must be replenished by taxation, the contrary is true. *Hagler v. City of Salem, supra; Hight v. City of Harrisonville, supra.*"

The proscription against municipal indebtedness without voter approval is only applicable in a situation where the municipality proposes to expend tax revenues. In the instant case the purchasing municipalities have no obligation to use tax monies to make the payments specified in the contract. To the contrary, the purchasing municipalities are obligated to make payments solely from the revenues of their electric systems, which places this situation within the parameters of the "special fund" doctrine. All the cases cited by relators involved situations where the municipality pledged tax revenues and are, therefore, distinguishable on that basis from the instant case.

Relators also contend that these contracts violate art. VI, sec. 26(b) of the constitution because the obligations of the purchasing municipalities are unconditional. Relators place particular reliance on *New Liberty Medical & Hospital Corp. v. E. F. Hutton & Co., supra.* That case is distinguishable, however, in that they proposed in addition

to using the rentals from the hospital to use *tax receipts* from the hospital district and, therefore, brought it within the indebtedness provision of art. VI, sec. 26(a) and (b), whereas, in the instant case, no tax revenues will be used by the purchasing municipalities.

Relators' final contention is that the purchasing municipalities are acting in violation of art. VI, sec. 27, Mo.Const., because they did not obtain voter approval of the "power sales contracts". That section provides: "Any city or incorporated town or village in this state, by vote of a majority of the qualified electors thereof voting thereon, may issue and sell its negotiable interest bearing revenue bonds for the purpose of paying all or part of the cost of purchasing, constructing, extending or improving any of the following: (1) revenue producing water, gas or electric light works, heating or power plants; (2) plants to be leased or otherwise disposed of pursuant to law to private persons or corporations for manufacturing and industrial development purposes, including the real estate, buildings, fixtures and machinery; or (3) airports; to be owned exclusively by the municipality, the cost of operation and maintenance and the principal and interest of the bonds to be payable solely from the revenues derived by the municipality from the operation of the utility or the lease of the plant."

Relators argue that the "power sales contracts" entered into by the purchasing municipalities provide the security necessary to market the Sikeston bonds and, as such, are comparable to "revenue obligations". Art. VI, sec. 27, however, does not refer to "revenue obligations", but instead specifically refers to "negotiable interest bearing revenue bonds". Furthermore, these contracts are not being entered into by the purchasing municipalities for the purpose of constructing a power plant, but instead were entered into in order to purchase electricity. Relators' point is overruled.

Relators' information in the nature of quo warranto is dismissed.

MORGAN, C. J., and FINCH, DONNELLY, RENDLEN and SEILER, JJ., and KELLY, Special Judge, concur.

HENLEY, J., not sitting.