WATSON, Judge.
The defendant taxpayers[1] have appealed from a trial court judgment in favor of plaintiff, the Board of Commissioners of the Louisiana Municipal Power Commission (LAMPCO). The trial court cast LAMPCO for costs, and plaintiff has answered the appeal, asking that the trial court judgment be amended to tax all costs to defendants.
The governing bodies of four Louisiana cities, Morgan City, Franklin, Opelousas and Natchitoches,[2] confected an intergovernmental agreement to create LAMPCO, a corporate political subdivision of the State of Louisiana. LAMPCO proposes to raise 90 million dollars by issuing revenue bonds under LSA-R.S. 33:1321-1337. The proceeds will be used to construct an experimental type of electric generating plant, referred to as a “115 MW synthesis-gas combined cycle” power plant.[3] Payment of the bonds is to be secured by power sales contracts, which LAMPCO has entered into with each of the four member cities. The cities will not directly guarantee the bonds. This action was brought under LSA-R.S. 13:5121-5130 to obtain judicial validation of the bonds and the power sales contracts.
It was stipulated that the bond resolution was not submitted to a referendum of the citizens of the four cities and that the four cities have outstanding bonds secured by pledge of the revenues of their individual utility systems.
*580 The power sales contracts provide that each of the cities shall pay a percentage of LAMPCO’s monthly costs, including debt service on the bonds, and each city will receive an equivalent percentage of the project’s capability, if any. The intergovernmental agreement provides that the cities’ percentages of energy can be adjusted, if one city needs less and another desires more. (P-1). Each city will continue to operate its own electric utility system, which will later be coordinated with LAMP-CO’s system. It is “expected” that the energy generated by LAMPCO during its first years of operation will be in excess of the four cities’ needs, and LAMPCO is to sell any surplus. (P-7, pg. 14). The payments by the cities are termed “monthly power costs” (P-7, pg. 10). These can include maintenance, renewal or replacement of the facility, debt service, all costs of production and any uninsured liability for damages. In addition to the monthly power costs, each city is to pay a ten per cent surcharge. (P-6, pg. 26). LAMPCO will submit a monthly statement to each of the cities, and is to prepare an annual budget of the estimated monthly power costs. The budget is to be reviewed at the end of each quarter and revised if necessary. The four identical contracts each state:
“The obligations of the City to make the payments required . . . payable as
an operating expense of its combined municipal utility system, payable solely from the revenues.and receipts of such combined municipal utility system . shall be made whether or not the project has been completed, is then operable or is operating, and . . . shall not be conditioned upon the performance or nonperformance by LAMPCO. . . . ” (P-7, pg. 11).
and
“. . . non-delivery of Project power and energy on account of Uncontrollable Forces or for any other reason shall not relieve the City from its obligation to make its payments required. . . (P-7, pg. 13).
If it develops that the project is not feasible and it is abandoned, the cities remain liable for payment of the bonds and any deficit. If one city defaults, the others are obligated to pay its share of monthly power costs. Either LAMPCO or the non-defaulting cities or both may sue for specific performance or other remedy against a city in default.
Payments by the member cities commence on January 1, 1981, when a total estimated to be $7,377,300 will be due. The city of Natchitoches will owe 27.4% or about $2,021,380. The net income of the Natchi-toches utility system in 1976 was $1,577,000, debt service on outstanding bonds used $897,433 of this amount. The profit of the system in 1976 was $649,309. W. Ray Scott, former mayor of Natchitoches, testified that $529,000 was transferred from utility profits to the general fund of the city in 1976. The city of Franklin will owe 12.6%, approximately $929,539. Revenues available from the Franklin utility system in 1976 were $83,000. Dr. Julius M. Fernandez, mayor of Franklin, testified that an $83,000 deficit in the Franklin general fund in 1976 was covered by a transfer from utility revenues. Opelousas’ percentage is 27.8% of the total debt service. Its initial payment will be about $2,050,889. Opelousas had not completed its 1976 audit but the 1975 figures show utility profits of $512,000. Joe Powers, mayor of Opelousas, testified that annual deficits in the city’s general account were covered by transfers from utility system profits. The deficit in 1975 was $459,-000. Morgan City is committed for 32.2% of the cost or $2,375,490. Its net utility income in 1976 was $534,014. Joseph Cefa-lu, councilman of Morgan City and former superintendent of its utility system, testified that money was transferred every year from Morgan City’s utility account to its general fund to balance the budget.
There is a dispute about the nature of the bonds LAMPCO proposes to issue. LAMP-CO contends that they are revenue bonds payable from a special fund, the utility receipts of the four cities. LSA-1974 *581 Const. Art. 6, § 37(A).[4] The defendant taxpayers counter that the cities are unconditionally obligated to pay the debt evidenced by the power sales contracts, and the bonds are in reality general obligations, subject to debt limitations, which can only be issued with approval of the electorate. LSA-1974 Const. Art. 6, § 33,[5] § 34.[6]
LAMPCO’s proposal represents a variation on a method of financing public improvements which has been used with varying success in other jurisdictions. See the discussions at 25 George Washington Law Review 377 and 68 Yale Law Journal 234.
The decisive issues are: whether the power sales contracts and proposed bonds are authorized by LSA-R.S. 33:1321-1337, in particular 33:1334, sections A[7] and C[8]; and whether the bonds are in violation of Arti- *582 ele 6, § 37(A) of the Louisiana Constitution of 1974.
LSA-R.S. 33:1334A requires that revenue bonds issued under its authority be payable “. . . solely from the revenues derived from the operation of the public project constructed or acquired with the proceeds of such revenue bonds. . . . ” LSA-R.S. 33:1336[9] provides in pertinent part that:
“. . . as to a joint commission created and acting pursuant to the authority of R.S. 33:1334, such bonds may be issued without the necessity of securing the approval of the electorate at a referendum.
[[Image here]]
LAMPCO contends that the cities are authorized to enter into the power sales contracts by the following provision of LSA-R.S. 33:1334C:
“. . . the municipalities may contract for services furnished by any joint facility constructed by the commission and the municipalities . may obligate themselves to make payments for such term, not exceeding forty years, and in such manner as may be provided in such contracts. . . . ”
However, this argument overlooks the preceding language in 33:1334C, which states that a municipality “. . . shall not in
any event be liable for the payment of the principal or interest on any revenue bonds of the commission except as provided in Subsection A of this Section . . . .”
The municipalities here are not contracting for services furnished but are unconditionally promising to pay LAMPCO regardless of whether LAMPCO performs its contractual obligation to furnish power. The revenues which LAMPCO will receive from the power sales contracts will not be derived solely from the operation of the public project but are to be paid with the income from the utility systems of the cities. The language of LSA-R.S. 33:1334A, supra, indicates that only a self-supporting, self-liquidating project falls within the purview of the statute. LAMPCO’s facility is to be financed by the four cities. Only by ignoring the true nature of the cities’ obligation can the project be regarded as self-supporting. See the discussion in Tucson Transit Authority, Inc. v. Nelson, 107 Ariz. 246, 485 P.2d 816 (1971).
The power sales contracts and the bonds which LAMPCO proposes to issue are not authorized by LSA-R.S. 33:1321-1337. The power sales contracts are not contracts for services, and the bonds are not true revenue bonds, which can be retired with the income from the facility to be constructed with their proceeds.
The proposed bonds are also unconstitutional under the Louisiana Constitution of 1974.
The provision in the power sales contracts that payments are to be made only from utility revenues is deceptive. The present utility revenues are inadequate for that purpose, and the member cities must make up the deficit. Each member city will be *583 liable not only for its own share but that of any defaulter. The obligations undertaken by the cities in the power sales contracts constitute a debt which can be enforced by judgment against a member city’s entire revenues and assets. The utility revenues of the member cities have been used to supplement the general revenues and now will be unavailable for that purpose. See City of Trinidad v. Haxby, 136 Colo. 168, 315 P.2d 204 (1957). The four cities have an unconditional obligation to pay the monthly power costs and surcharges provided in the power sales contracts. The exact amount of the payments is unknown, since they include not only debt service but the cost of maintenance, replacement, renewal and production. Clearly, the amount payable from the cities to LAMPCO can become “. . .a charge upon the other income and revenues of the political subdivision” in violation of LSA-Const. 1974, Art. 6, § 37(A).
The court’s analysis in Board of Supervisors of Fairfax County v. Massey, 210 Va. 253, 169 S.E.2d 556 (1969) is pertinent:
“The obligations of the County and City to underwrite and guarantee an unknown ‘operating expense’ deficit of the transit system are fixed and absolute and constitute a present debt within the meaning of the constitutional limitations on County and City debt or indebtedness.
“There are no facts in the record, . to show that the County’s obligation under the Agreement can be paid out of current revenues or that there has been an election by the people of the County authorizing the obligation to be incurred.” 169 S.E.2d 561.
The obligations of LAMPCO’s member cities are potential general obligations. There is no showing that the special fund of utility revenues will be adequate. Should it prove insufficient, the cities would be required to maintain the special fund out of their general funds. City of Redondo Beach v. Taxpayers, Property Owners, etc., 54 Cal.2d 126, 5 Cal.Rptr. 10, 352 P.2d 170 (1960) points out that an unconditional promise to make certain payments, which must be raised from other sources if the utility revenues constituting the special fund are inadequate, constitutes a potential drain on a city’s general revenues, and hence must be approved by the voters. See Fjeldsted v. Ogden City, 83 Utah 273, 28 P.2d 144 (1933) and Scroggs v. Kansas City, 499 S.W.2d 500 (Mo., 1973).
Counsel for LAMPCO cite numerous cases in support of the proposed bond issuance and re-payment scheme. These include: State ex rel. Mitchell v. City of Sikeston, 555 S.W.2d 281 (Mo., 1977); Arata v. Louisiana Stadium and Exposition District, 254 La. 579, 225 So.2d 362 (1969); McCann v. Mayor and Councilmen of Morgan City, 173 La. 1063, 139 So. 481 (1932); Police Jury v. All Taxpayers, etc., 278 So.2d 474 (La., 1973); Frank v. City of Cody, Wyo., 572 P.2d 1106 (Wyo., 1977); and Thompson v. Municipal Elec. Authority of Georgia, 238 Ga. 19, 231 S.E.2d 720 (1976). However, none of these cases are decisive as to the LAMPCO proposal.
State ex rel. Mitchell v. City of Sikeston, supra, considered a project very similar to LAMPCO’s. The power sales contracts required the participating municipalities to pay the contract price regardless of whether or not power was available from the project. The Supreme Court of Missouri held that the financing arrangements were constitutional, stating that:
“The revenue bonds proposed by Sikeston are to be paid solely out of the revenues generated from the sale of electricity and not from money raised by taxation.” 555 S.W.2d 291.
and
“. . . the purchasing municipalities are obligated to make payments solely from the revenues of their electric systems, which places this situation within the parameters of the ‘special fund’ doctrine.” 555 S.W.2d 292.
However, there was an election in which the voters of Sikeston approved the issuance of the bonds.[10] Such an election is a *584 prerequisite to a general obligation bond in many jurisdictions, including Louisiana.
Arata, supra, dealt with a particular constitutional amendment, approved by the electorate, which authorized construction of the Louisiana Superdome. The lease payments considered in Arata were an unconditional obligation analogous to that created by these power sales contracts. Arata indicated that the lease payments did not necessarily involve a pledge of the state’s full faith and credit but found the payments constitutionally authorized even if such a pledge existed. Arata is not decisive on the point at issue here, since it involved a specific constitutional amendment which was overwhelmingly approved by the citizens of the state.
McCann, supra, dealt with statutory language similar but not identical to that in the instant case and held that Morgan City could issue bonds to provide a combined water and power plant, secured by pledge of the combined utilities’ revenues and a mortgage on its lands, buildings and equipment. The bonds had been approved by the voters.
Police Jury v. All Taxpayers, etc., supra, held that special obligation industrial revenue bonds, which only constitute a charge on the particular property encumbered, can be issued without an election. The Police Jury case discusses the distinction between special and general obligation bonds, which is significant here, and points out that a general obligation bond is one which:
“. . . subjects the property and income of the taxing subdivision to levy in satisfaction of the obligation imposed thereby.” 278 So.2d 479.
The opinion in Cody, supra, states that “payments due for electricity sold to each municipality is payable only from revenues derived from the retail sale of electricity to the customers of the municipal distribution system.” Here, payments by the member cities are not related to the power purchased.
Thompson, supra, is not clear as to the exact nature of the participating cities’ obligations, although the Georgia Supreme Court does appear to validate a contract and bond plan similar to the LAMPCO proposal. The LAMPCO bonds and power sales contracts must be judged under the applicable Louisiana statutes and the Louisiana Constitution, which may differ from those of Georgia.
The proposed facility may be an economical and desirable solution to member cities’ energy problems, but the power sales contracts and the proposed bonds are not authorized by LSA-R.S. 33:1321-1337 and are unconstitutional under LSA-1974 Const. Art. 6, § 37(A).
For the foregoing reasons, the judgment of the trial court herein is reversed. It is ordered, adjudged and decreed that there be judgment in favor of defendants, All Taxpayers, etc., and against plaintiff, Board of Commissioners of Louisiana Municipal Power Commission, dismissing the plaintiff’s demands as contained in the Motion for Judgment filed in these proceedings, and declaring the power sales contracts and the proposed bonds to be null and void as not authorized by the Louisiana Revised Statutes and in violation of the Louisiana Constitution. All costs of these proceedings are assessed against plaintiff-appellee, the Louisiana Municipal Power Commission.
REVERSED.
DOMENGEAUX, J., concurs in the result reached and assigns brief reasons.
FORET, J., concurs in the result reached for the reasons argued by DOMENGEAUX, J.

. 402 defendants have made an appearance.

. The City of Thibodaux, an original participant, withdrew from LAMPCO.

. The “Texaco Synthesis Gas Generation (TSGG) Process”, which produces gas from “high-sulphur vacuum bottle residue” is to be used initially with future modification to use a process being developed, the “Texaco Coal Ga-sification Process”, which is to utilize 50% coal and 50% oil slurry as a power source. (P-19, pg. 1). Other possible future fuels are “refinery coke and lignite, in slurry form.” (P-19, Pg- 2).

. LSA-1974 Const. Art. 6, § 37(A):
“Section 37. (A) Authorization. The legislature by law may authorize political subdivisions to issue bonds or other debt obligations to construct, acquire, extend, or improve any revenue-producing public utility or work of public improvement. The bonds or other debt obligations may-be secured by mortgage on the lands, buildings, machinery, and equipment or by the pledge of the income and revenues of the public utility or work of public improvement. They shall not be a charge upon the other income and revenues of the political subdivision.”

. LSA-1974 Const. Art. 6, § 33:
“Section 33. (A) Authorization. Subject to approval by the State Bond Commission or its successor, general obligation bonds may be issued only after authorization by a majority of the electors voting on the proposition at an election in the political subdivision issuing the bonds. Bonds to refund outstanding indebtedness at the same or at a lower effective rate of interest, even though payable solely from ad valorem taxes, need not be authorized at an election if the indebtedness refunded is paid or cancelled at the time of the delivery of the refunding bonds, or if money, or securities made eligible for such purpose by law, are deposited in escrow in an adequate amount, with interest, to be utilized solely to retire the refunded indebtedness or bonds and to pay interest thereon and redemption premiums, if any, to the time of retirement.
(B) Full Faith and Credit. The full faith and credit of a political subdivision is hereby pledged to the payment of general obligation bonds issued by it under this constitution or the statute or proceedings pursuant to which they are issued. The governing authority of the issuing political subdivision shall levy and collect or cause to be levied and collected on all taxable property in the political subdivision ad valorem taxes sufficient to pay principal and interest and redemption premiums, if any, on such bonds as they mature.”

. LSA-1974 Const. Art. 6, § 34:
“Section 34. The legislature by law shall fix the limitation on bonded indebtedness payable solely from ad valorem taxes levied by political subdivisions.”

. LSA-R.S. 33:1334A:
“A. Any joint commission created by any parishes or municipalities as an agency and instrumentality of such parishes and municipalities under the provisions of this Part shall have the power, if provided in the agreement entered into between such parishes and municipalities, to issue in its corporate name, any revenue bonds of such commission to finance the cost of the construction or acquisition or improvement of such public projects or improvements, including but not limited to, the public purposes described in R.S. 33:1324, which bonds may be the joint obligation, several obligations, or joint and several obligations of such parishes and municipalities, payable, however, solely from the revenues derived from the operation of the public project constructed or acquired with the proceeds of such revenue bonds. Title to such project shall vest in the parties to said agreement in the proportion or maimer set forth in such agreement. Notwithstanding any other provision of Louisiana law relative to the right of partition available to owners of property or portions of property, the right of partition shall not be available to any party with respect to any property acquired or held subject to the terms of said agreement; however, the agreement may provide for the sale, lease, or other disposition of such property on such terms and conditions as may be set forth in the agreement.”

. LSA-R.S. 33:1334C:
“C. The municipality or the parish shall not in any event be liable for the payment of the principal or interest on any revenue bonds of the commission except as provided in Subsection A of this Section and, in addition, the municipalities or the parishes may contract for services furnished by any joint facility constructed by the commission and the municipalities and parishes may obligate themselves to make payments for such term, not exceeding forty years, and in such manner as may be provided in such contracts. None of the bonds of the commission shall be construed to constitute an indebtedness of the municipality or parish for debt limit or other purposes within the meaning of any constitutional or statutory provisions whatsoever.”

. LSA-R.S. 33:1336:
“Any municipality and/or joint commission entering into a Contract pursuant to the provisions of R.S. 33:1335 may appropriate such sums as are necessary to fulfill its obligations under the terms of such Contract, and may incur debt and issue revenue bonds for the purpose of providing the municipality and/or joint commission’s share of the cost of the construction and acquisition of the joint electric power generation and transmission facilities authorized under the provisions of R.S. 33:1335. Said bonds may be issued by any municipality and/or joint commission substantially in compliance with the procedures established by Subpart C, Part 1, Chapter 10, Title 33 of the Louisiana Revised Statutes of 1950, but as to a joint commission created and acting pursuant to the authority of R.S. 33:1334, such bonds may be issued without the necessity of securing the approval of the electorate at a referendum. All properties or interest in properties at any time owned by a municipality and/or joint commission, and all bonds issued by a municipality and/or joint commission under the authority of this Section and the income therefrom shall be exempt from all taxation in the state of Louisiana. Also, for the purpose of R.S. 51:702(2) and any amendment thereto or substitution therefor, bonds issued by a municipality and/or joint commission hereunder shall be determined to be securities issued by a public instrumentality of a political subdivision of the state of Louisiana. The provisions of R.S. 33:1334(E) shall be applicable to bonds issued under this Section.”

. “The proposition to authorize the bonds was passed by the voters of Sikeston at the general election of November 2, 1976.” 555 S.W.2d 283.