**STATE of Missouri ex rel. William R. TAYLOR, Relator,**

v.

**LAND CLEARANCE FOR REDEVELOPMENT AUTHORITY OF KANSAS CITY, Missouri, a public corporation under the laws of Missouri, Respondent.**

No. 61220.

Supreme Court of Missouri,
En Banc.

Sept. 11, 1979.

Rehearing Denied Oct. 10, 1979.

Wm. B. Morgan, Campbell, Gilmore, Erickson, Cottingham, Morgan & Gibson, Kansas City, for relator.

Lawrence M. Berkowitz, Judson L. Palmer, Jr., James S. Allen, Jr., Stinson, Mag & Fizzell, Thomas W. Tierney, Tierney, Pierce & Ernst, Kansas City, for respondent.

W. Scott Snyder, Columbia, Irvin Dagen, St. Louis, Howard C. Wright, Jr., Springfield, amicus curiae.

WELLIVER, Judge.

This is an original information in the nature of quo warranto. It is filed by relator William R. Taylor with the approval of the Attorney General to test the authority of respondent Land Clearance for Redevelopment Authority of Kansas City, hereinafter referred to as "LCRA", to issue Mortgage Revenue Bonds and Housing Revenue Bonds. The relator is an individual resident, registered voter and taxpayer residing at 9 West 125th Terrace in Kansas City, Missouri, and respondent LCRA is a public corporation organized and existing pursuant to the provisions of §§ 99.300 to 99.660, RSMo 1978.

The information filed by relator challenges the statutory authority for and the legality and constitutionality of respondent's actions taken in the process of attempting to issue fifteen million dollars of bonds. We find and hold that respondent has exceeded its statutory authority in attempting to issue these Mortgage and Housing Revenue Bonds.

The facts are stipulated or admitted in pleadings. Respondent LCRA of Kansas City, Missouri, has adopted resolutions and is taking actions to issue and sell its Mortgage Revenue Bonds and its Housing Revenue Bonds (collectively, the "Bonds"). The Bonds will not be payable from funds raised by taxation. It is intended that interest on the Bonds will be exempt from federal income taxation.

The proceeds of the sale of the Mortgage Revenue Bonds are intended to be used to make loans to individuals (the "Mortgagors") who will either be occupiers, developers, or landlord-owners of single-family or two-to-four-family residences in Kansas City, Missouri. Landlords need not reside in the mortgaged premises. Respondent intends to make some loans "involving mortgagors of moderate and high income levels." It intends "to finance some mortgages without limitation to the maximum amount of the loan or the maximum value of the property". Respondent intends to contract with other persons who will service some of the mortgage loans by collecting and appropriately applying monthly payments from the Mortgagors and enforcing the terms of the mortgage loans. The proceeds of the sale of the Housing Revenue Bonds would be used to make loans to private lenders (the "Lenders") who will make loans to Mortgagors.

It is intended that the tax-exempt interest on the bonds will permit respondent to make available loans to the Mortgagors and Lenders at lower rates of interest than conventional market rates, thereby reducing the principal and interest payments of the Mortgagors. The Mortgagors would be required to use the proceeds of the mortgage loans for the purchase, construction or rehabilitation of residential units. These residential units must be located on land necessary or incidental to the respondent's land clearance or urban renewal projects. Respondent intends to exercise its own discretion with respect to whether a particular property is "incidental" to a land clearance or urban renewal project.

Respondent would pledge an appropriate portion of the collective monthly payments from the Mortgagors or the Lenders to pay principal and interest due on the Mortgage Revenue Bonds or the Housing Revenue Bonds, respectively. Each mortgage loan made from the proceeds of the Mortgage Revenue Bonds would be required to be insured or guaranteed and the proceeds of such insurance and guarantees along with reserves would also be pledged to the owners of the Mortgage Revenue Bonds. The Housing Revenue Bonds would be secured by securities guaranteed by the Government National Mortgage Association.

Respondent contends that statutory authorization for issuance of these Bonds can be inferred from any of the following statutory provisions.

(1) § 99.480.1 gives the Authority the power to issue bonds "for any of its corporate purposes."

(2) § 99.420.4 gives the Authority power "to prevent a recurrence of blighted or insanitary areas or to effectuate the purposes of this law" and the power to issue these Bonds can be inferred therefrom.

(3) § 99.420.14 grants the power "[t]o exercise all powers or parts or combinations of powers necessary, convenient or appropriate to undertake and carry out land clearance, redevelopment and urban renewal plans and projects and all the powers herein granted."

(4) § 99.420.4 uses the word "develop".

(5) § 99.320.16 defines "real property" for the purposes of the act to include "liens by way of judgment, mortgage or otherwise and the indebtedness secured by such liens."

(6) § 99.650 provides that "[t]his law shall be construed liberally to effectuate the purposes hereof. Insofar as the provisions of this law are inconsistent with the provisions of any other law, the provisions of this law shall be controlling."

Respondent then alleges that there is a proper public purpose for its actions in issuing the Bonds, that the Bonds are constitutional under Article VI, Sections 23 and 25 of the Constitution, and that servicing of mortgage loans would not be an unlawful delegation of powers by the LCRA.

The Land Clearance for Redevelopment Authorities of Columbia, Springfield and St. Louis have filed briefs amici curiae in support of respondent's asserted authority to issue the Bonds.

Relator urges that the actions and intended actions of the respondent are not within its statutory grant of power. Relator

quotes the following language from *Taylor v. Dimmitt*, 336 Mo. 330, 336, 78 S.W.2d 841, 843 (1934):

> It is a general and undisputed proposition of law that a municipal corporation possesses and can exercise the following powers, and no others: (1) Those granted in express words; (2) those necessarily or fairly implied in, or incident to, the powers expressly granted; (3) those *essential* to the declared objects and purposes of the corporation—not simply convenient, but indispensable. Any fair, reasonable doubt concerning the existence of power is resolved by the courts against the corporation, and the power is denied.

In *State ex rel. Mitchell v. City of Sikeston*, 555 S.W.2d 281, 288 (Mo. banc 1977), this court reaffirmed the principle that a municipal corporation has only the powers granted to it by the legislature.

To address the question of statutory construction presented, it is helpful to look at the historical development of housing legislation in this and other states. Respondent Authority was created by, and derives its powers from the Land Clearance for Redevelopment Authority Law, hereinafter referred to as the "LCRA Law", §§ 99.300 to 99.660, RSMo 1978, first enacted in 1951. The LCRA Law is typical of redevelopment authority statutes passed in many states, primarily in the decade following World War II.[1] Such urban redevelopment authorities are commonly authorized to issue revenue bonds to finance projects involving the clearance and redevelopment of blighted and insanitary areas. These statutes commonly empower the redevelopment authorities to acquire property and to pay off liens and encumbrances existing on such property for that purpose. The introductory clause of § 99.420 expressly provides that the powers enumerated therein are those necessary or convenient to carry out the purposes of the LCRA Law, and respondent's powers must be construed in the light of those purposes. This court considered the purposes of the LCRA Law in *State on Inf. of Dalton v. Land Clearance for Redevelopment Authority*, 364 Mo. 974, 270 S.W.2d 44 (1954). In *Dalton*, relator challenged the validity of the LCRA Law on the ground that it violated Mo.Const. art. III, § 23, which provides that "[n]o bill shall contain more than one subject which shall be clearly expressed in its title." The court denied this contention, stating that "[t]he Law here in question deals with one general subject matter and has one purpose: the eradication and redevelopment of blighted and insanitary areas." *Id.* 270 S.W.2d at 54.

In the late 1960's a number of states began to enact legislation to slow the acceleration of urban deterioration caused by shortages in certain neighborhoods of mortgage capital. The legislatures focused attention on practices of private commercial lending institutions of "redlining," *i. e.*, refusing to grant mortgages and home improvement loans in deteriorating urban

---

1. Among these are Alaska's City Housing Law of 1935, Alaska Stat. §§ 18.55.480 to 18.55.996 (1978); California's Limited Dividend Housing Corporations Law of 1951, Cal. Health and Safety Code §§ 34800 to 34948 (1973); Colorado City Housing Law of 1935, Colo.Rev.Stat. §§ 29-4-101 to 29-4-123 (1977); Georgia's Housing Authorities Law of 1937, Ga.Code Ann. §§ 99-1101 to 99-1170 (1976); Iowa's Urban Renewal Law of 1957, Iowa Code Ann. §§ 403.1 to 403.18 (West 1976); Maine Housing Authorities Act of 1954, Me.Rev.Stat. tit. 30, §§ 4551 to 4788 (1978); Michigan's municipal rehabilitation legislation of 1945, Mich.Stat. Ann. §§ 125.71 to 125.84 (1976); Minnesota's Municipal Housing and Redevelopment Act of 1947, Minn.Stat.Ann. §§ 462.411 *et seq.* (West 1962); Montana's Housing Authorities Law of 1935, Mont.Rev.Codes Ann. §§ 35-101 to 35- 146 (1961); North Carolina's Urban Redevelopment Law of 1951, N.C.Gen.Stat. §§ 160A-500 to 160A-526 (1976); Oregon's Housing Authorities Law, Or.Rev.Stat. §§ 456.055 to 456.230 (1977); Pennsylvania's Urban Redevelopment Law of 1945, 35 Pa.Cons.Stat.Ann. §§ 1701 to 1747 (Purdon 1977); Rhode Island's Redevelopment Act of 1956, R.I.Gen. Laws §§ 45-31-1 to 45-33-17 (1971); Tennessee's Housing Authorities Law of 1935, Tenn.Code Ann. §§ 13-801 to 13-833 (1973); Utah's Community Development Law of 1965, Utah Code Ann. §§ 11-15-1 to 11-15-152 (1973); Vermont's Urban Renewal Act of 1957, Vt.Stat.Ann. tit. 24, §§ 3201 to 3221 (1975); West Virginia's Urban Renewal Authority Law of 1951, W.Va.Code §§ 16-18-1 to 16-18-29 (1972); and Wisconsin's Urban Redevelopment Law of 1943, Wis.Stat.Ann. §§ 66.405 to 66.425, 66.431 (1965).

neighborhoods. The diversion of investment capital from depositors in redlined neighborhoods to borrowers in other areas is known as disinvestment. The practice developed because such investments are less secure than loans for property elsewhere.[2] The lack of incentive for absentee landlords and real estate speculators to invest funds to maintain buildings is seen as exacerbating the deterioration process. Hearings on S. 1281 before the Senate Committee on Banking, Housing and Urban Affairs, 94 Cong., 1st Sess., pt. 1 at 551–54 (1975) (report by Sternlieb, Burchell & Listokin). The common legislative response to the problem of housing shortages caused by a shortage of mortgage financing was to create a statewide housing finance authority.[3] Most of the housing finance authority statutes concentrate the power to lend money to buyers of homes in a centralized finance agency. The lending power is circumscribed by numerous restrictions. Most such agencies are authorized to make loans only for residential housing and only to low to moderate income borrowers. Frequently such loans may be made only after an administrative determination that they are unavailable from private commercial lenders. Other limitations have been placed on the permissible amount of individual loans and on the aggregate indebtedness that the agency is permitted to incur.

Missouri's Housing Development Commission Act of 1969, §§ 215.010 to 215.250, RSMo 1978 represents our General Assembly's response to the general problems of financing of low cost housing and the related problems of disinvestment and redlining of neighborhoods by commercial mortgage lenders. It empowers the Housing Development Commission to issue revenue bonds to raise funds to "make, purchase or participate in the purchase of uninsured, partially insured or fully insured first mortgage loans . . . to finance the building or rehabilitation of residential housing" for low or moderate income persons. § 215.-030.1. Unlike the LCRA Law, the Housing Development Commission Act provides for the centralization of delegated powers in a single state agency. § 215.020. The Commission's power to purchase and insure first mortgage loans is limited to loans for residential housing, and only loans to low to moderate income borrowers are authorized. § 215.030.1 and .2. The power of the Commission to make construction loans is limited to federally insured loans to sponsors of residential housing for occupancy by persons and families of low to moderate income. § 215.030.3. Construction loans are further required to "be made only upon determination by the commission that construction loans are not otherwise available, wholly or in part, from lenders upon reason-

**2.** The way in which the unavailability of mortgage loans causes deterioration of a redlined neighborhood is outlined in Note, Attacking the Urban Redlining Problem, 56 Boston U.L.Rev. 989, 997 (1976):

Current homeowners, recognizing both the lower demand for housing in their neighborhood and its resultant effect on property values, realize that the sale of their homes will no longer yield a return equivalent to their investments. Owners of multi-family homes no longer feel capable of refinancing their properties in order to retrieve capital for further investment purposes. Thus, the homes in the area become nothing more than costly burdens to their owners. Any further expenditures seem both unwarranted and wasteful. As a result, homeowners keep maintenance and repair costs at a minimum, and the neighborhood deteriorates.

**3.** Cal.Health and Safety Code §§ 37910 to 37964 (Supp.1979); Colo.Rev.Stat. §§ 29–4–701 to 29–4–732 (Supp.1978); Ga.Code Ann. §§ 99–3601 to 99–3612 (Supp.1978); Iowa Code Ann. §§ 220.1 to 220.36 (Supp.1979); 30 Me.Rev. Stat. § 4601A (1978); Mich.Stat.Ann. §§ 125.-1401 to 125.1496 (1976); Minn.Stat.Ann. §§ 462A.01 to 462A.24 (Supp.1979); Mont.Rev. Codes Ann. §§ 35–501 to 35–526 (Supp.1977); N.C.Gen.Stat. §§ 122A–1 to 122A–23 (Supp. 1977); Or.Rev.Stat. §§ 456.550 to 456.720 (1977); 35 Pa.Cons.Stat.Ann. §§ 1680.101 to 1680.603a (Purdon 1977); R.I.Gen.Laws §§ 42–55–1 to 42–55–27 (1977); Tenn.Code Ann. §§ 13–2201 to 13–2214 (Supp.1978); Utah Code Ann. §§ 63–44a–1 to 63–44a–20 (1978); Vt. Stat.Ann. tit. 10, §§ 381 to 398 (Supp.1978); W.Va.Code §§ 31–18–1 to 31–18–25 (1975); Wis.Stat.Ann. §§ 234.01 to 234.44 (Supp.1979).

It has been reported that thirty-nine states had enacted legislation creating state housing finance agencies by 1976. Note, State Housing Finance Agencies: The Iowa Blueprint, 62 Iowa L.Rev. 1524, 1524 n. 12 (1976–77).

ably equivalent terms and conditions." *Id.* Originally, the Housing Development Commission was authorized to issue no more than $100 million in bonds, but this was raised in 1974 to $200 million of bonding authority. § 215.160, RSMo 1978; Laws of Mo.1969, p. 362; Laws of Mo.1974, pp. 826–27.

We are persuaded that the LCRA Law does not explicitly extend the power to the respondent to act as a mortgage lender, nor is such power fairly implied in or incident to powers expressly granted in the statute, nor is such power essential or indispensable to attaining the purposes expressed in the statute. No case has been cited to or found by this court in which this or any other state has construed the language of its LCRA Law to include the authority to issue revenue bonds to become a mortgage lender as respondent proposes to do. The provision in § 99.650 that the LCRA Law should be liberally construed to effectuate its purposes and the provision in § 99.420.14 granting all necessary and appropriate powers for attainment of the purposes of the law, place no obligation on this court to infer new and additional purposes over and beyond those purposes originally contemplated by the legislature. Respondent's argument that its authority to "develop" buildings in carrying out its statutory purpose "includes providing financing for the ultimate purchaser" severs the word from context and attributes to it a sense that is far removed from the meaning of the term in the series in which it appears. We find no merit in respondent's contention that the difference in wording between the grants of power in the LCRA Law and the grants of power in the Housing Development Commission Act represents only an evolution in the General Assembly's writing style over the eighteen years that elapsed between the passage of the two statutes.

Historically, housing finance laws have followed and supplemented the LCRA Laws of the various states.

We find no state which has by judicial interpretation read into its LCRA Law, the mortgage financing powers herein sought to be established by respondent. We find no special provisions distinguishing the Missouri LCRA Law in this respect and from which we can infer the alleged power to issue revenue bonds and engage in mortgage financing. For the reasons stated, we find and hold that respondent, LCRA of Kansas City, has exceeded its statutory authority in attempting to issue its Mortgage Revenue Bonds and Housing Revenue Bonds.

Having found the lack of statutory authority to act, we find it unnecessary to address the constitutional questions briefed by the parties. The requested ouster is granted and judgment is entered in favor of relator.

DONNELLY, RENDLEN and MORGAN, JJ., and HENLEY, Senior Judge, concur.

SEILER, J., dissents in separate dissenting opinion filed.

BARDGETT, C. J., dissents and concurs in separate dissenting opinion of SEILER, J.

HIGGINS, J., not participating because not a member of the court when cause was submitted.

SEILER, Judge, dissenting.

I must respectfully dissent. I am unable to believe that we should interpret the statutory provisions before us according to language quoted in the principal opinion from *Taylor v. Dimmitt,* 336 Mo. 330, 78 S.W.2d 841, 843 (1934), whereby the Land Clearance for Redevelopment Authority has only such powers as remain after resolving any reasonable doubts as to the existence of power against the corporation. I say this because the statute before us contains in its body the construction which is to be placed upon it and it seems to me that we are bound by such declaration on the part of the lawmakers. I refer to § 99.650, which contains the following sentence: "This law shall be construed liberally to effectuate the purposes hereof." Where a rule of construction is contained in the statute itself, that rule should be applied if it is necessary

to use any rules of construction in determining the meaning or effect of the law. *State ex rel. Triay v. Burr,* 79 Fla. 290, 84 So. 61, 74 (1920). *See also,* 82 C.J.S. Statutes § 315, as follows: "The legislature may define certain words used in the statute, or declare in the body of the Act, the construction to be placed thereon, and the court is bound by such definition or construction, and will apply it . . . although otherwise the language would have been construed to mean a thing different from that contemplated by such . . . rule of construction."

The principal opinion refers to *State ex rel. Mitchell v. City of Sikeston,* 555 S.W.2d 281, 288 (Mo. banc 1977). There the court quoted the same language from *Taylor v. Dimmitt* relied upon here, but the *Sikeston* case was dealing with § 91.010, RSMo 1969, which authorizes municipalities to purchase power from vendor cities and which contains no language about how it shall be construed, unlike the statutes before us. In addition, the court in *City of Sikeston* distinguished *Taylor v. Dimmitt* upon its facts, pointing out there were two statutes there involved, both dealing directly with municipalities and the only question before the court was whether these statutes authorized the vendor municipality to erect transmission facilities outside the city. The court pointed out that the second of the two statutes explicitly gave this authority to the purchasing municipality, thus evidencing a desire on the part of the legislature to preclude vendor municipalities from the field. Assuming that a Land Clearance for Redevelopment Authority is to be considered the same as a municipal corporation in determining what powers it can exercise,[1] I do not believe *City of Sikeston* supports the narrow interpretation of powers used in the principal opinion, despite its reference to *Taylor v. Dimmitt.*

One of the exhibits before us is exhibit D, the urban renewal map for Kansas City, Missouri. There are some 17 areas designated for urban renewal activity in Kansas City. Some of these areas are quite extensive, covering hundreds of city blocks. Each proposed area has received the approval of the Kansas City city council.

There is more to successful urban renewal than the leveling of structures in slum areas and the clearing of the land. The area must then be put to some constructive use. Section 99.310, which states the legislative declaration as to the purpose of the law, makes it clear that the construction of housing, not merely the razing of slum or delapidated areas, is the final objective of the Act. One of the ways to do this is to make money available to developers, builders, and owners.

As is suggested in one of the amici briefs, inflation makes it more and more difficult to build new or renovate older family residences and to attract the necessary mortgage funds for inner city residential neighborhoods. One incentive would be a lower mortgage interest rate which can be achieved by use of the proposed bonds. Counsel suggests, and I believe accurately, that "[i]f ever there was a need which has caught up with the intent of the law, it is in the present instance, wherein the Respondent contemplates the utilization of the Redevelopment Act for the issuance of its mortgage bonds for home renovation and construction."

Section 99.480 gives the authority the power to issue bonds. It states:

"(1) An authority shall have the power to issue bonds from time to time in its discretion *for any of its corporate purposes* including the payment of principal and interest . . .

". . .

"(3) An authority may issue such types of bonds as it may determine, including (*without limiting the generality of the foregoing*) bonds on which the principal and interest are payable: [from proceeds of the projects whether or not that project was financed by the bonds]." (emphasis added)

---

1. This proposition seems to me to be somewhat questionable, as the statute, § 99.320(2) defines the authority as "a public body corporate and politic" and does not call it a municipality.

*Compare* § 99.020(2), RSMo 1978 where under the Housing Authorities law a "housing authority" is expressly declared to be a municipal corporation.

From this, given the liberal construction provision in particular, it appears that the authority is given discretion to issue any type of bond it finds appropriate to effectuate any of its corporate purposes. Thus, it would seem that bonds to finance mortgages and loans to lenders should be proper if they effectuate a corporate purpose.

The question then becomes, what are the authority's corporate purposes? If this refers to the declaration of policy in § 99.310, then that section must be analyzed. Indeed, the principal opinion points out that respondent's powers must be construed in the light of those purposes. That section sets out the evils of unsafe and insanitary housing and housing areas, and says that unsafe conditions, etc., are beyond control by conventional methods and: "that the elimination or prevention of the detrimental conditions in such areas, the acquisition and preparation of land in or necessary to the development, renewal or rehabilitation of such areas and its sale or lease for development, renewal or rehabilitation in accordance with general plans and redevelopment or urban renewal plans of communities and any assistance which may be given any public body in connection therewith are public uses and purposes for which public money may be expended and private property acquired" and that certain areas may be beyond help and need to be cleared, but, where possible, rehabilitation shall be used. It concludes that a municipality shall, to the greatest extent feasible in carrying out this law, "afford maximum opportunity, consistent with the sound needs of the municipality as a whole, to the rehabilitation or redevelopment or renewal of areas by private enterprise."

Thus, the policy provisions state that the purpose of the law is to end blight through clearance and redevelopment, with a preference toward redevelopment through rehabilitation and through the use of private enterprise. What more appropriate method of carrying this purpose out than through a bond issue which enables the authority to make loans to individuals for mortgages for redeveloping one-to-four-family residences, and through loans to private lenders who will in turn make loans to individual mortgagors? The latter will allow maximum involvement from private enterprise within the confines of the purposes of the Act to remove blight and to redevelop.

If "corporate purposes" in § 99.480 refers to more specific corporate powers, then § 99.420, defining corporate powers (as opposed to policy) becomes relevant. The section begins: "An authority shall constitute a public body corporate and politic, exercising public and essential governmental functions, and having all powers necessary or convenient to carry out and effectuate the purposes and provisions of this law, including the following powers in addition to others herein granted."

The final subsection of § 99.420 states: "(14) To exercise all powers or parts or combinations of powers necessary, convenient or appropriate to undertake and carry out land clearance, redevelopment and urban renewal plans and projects and all powers herein granted."

Thus the bond power could properly be combined with some other powers set out in § 99.420 to help carry out the purposes of land clearance and redevelopment.

Section 99.420(4) states: "Within its area of operation [the authority shall have the power] to purchase, lease, obtain options upon, acquire . . . any real or personal property or any interest therein . . . necessary or incidental to a land clearance project or urban renewal project; to hold, improve, clear or prepare for redevelopment or urban renewal any such property; to develop, construct, reconstruct, rehabilitate, repair or improve residences, houses, buildings, structures and other facilities . . . to enter into contracts with redevelopers of property . . . regarding the use of such property for residential, commercial, industrial, recreational purposes or for public purposes . . . ."

"Land clearance project" is defined by § 99.320(10)(d) as "any work or undertaking: " "[t]o develop, construct, reconstruct, rehabilitate, repair or improve residences, houses, buildings, structures and other facilities."

A "redeveloper" is defined by § 99.320(17) as "any person, partnership, or public or

private corporation or agency which enters or proposes to enter into a redevelopment or rehabilitation or renewal contract."

Subsection (16), § 99.320 defines real property to include "liens by way of . . mortgage." Thus, the authority can acquire mortgages, and can hold, improve, or prepare for redevelopment such property: that is, it can use the mortgages to help in redevelopment. This is exactly what both the proposed mortgage revenue bonds and housing revenue bonds will ultimately do, and it seems to me the Act, reasonably construed, authorizes their issuance.

The principal opinion refers to the Housing Development Commission Act of 1969 as representing the legislature's response to the general problems of financing of low cost housing and the related problems of redlining of neighborhoods by commercial mortgage lenders. However, I fail to see how this later statute controls what the proper interpretation should be of the much earlier adopted Land Clearance for Redevelopment Law. Particularly is this true in light of the express provision at the close of § 99.420(4) of the Land Clearance Act "that no statutory provision with respect to the acquisition, clearance or disposition of property by other public bodies shall restrict an authority or other public bodies exercising powers hereunder, in such functions, unless the legislature shall specifically so state." I do not believe that the Housing Development Commission Act contains any such restriction or that it can be regarded as preempting or excluding power of the authority to issue the bonds under consideration.

The principal opinion mentions that the authority says that it may finance some loans or real property located outside the urban renewal projects but within the city limits of Kansas City, which the authority considers incidental to a specific land clearance or urban renewal project.[2] If the development is "incidental" to a project, then it is associated, related, linked or connected with the project. It seems to me that is

sufficient to keep the authority within proper bounds in this respect. If a case arises where this is not true, the matter can be dealt with accordingly from time to time as needed. I do not believe the fact that the authority has in mind such incidental matters means that the issuance of the bonds under consideration is beyond the powers of the authority.

I fear that for us to turn down what seems to be a highly practical and legally permissible means of developing urban renewal areas would be to strike a crippling blow at the Land Clearance for Redevelopment authority and would be contrary to the intention of the legislature as to what such an authority may do. I therefore would uphold the issuance of the bonds by the authority and for these reasons I dissent.

---

2. The authority is expressly given the power by § 99.420(4) to purchase, lease or otherwise acquire real estate "necessary or incidental" to a land clearance or urban renewal project and to

"improve, clear or prepare for redevelopment or urban renewal any such property," within its area of operation, which is defined by § 99.-320(1) to be "the area within the municipality."